223 S.W.3d 916 (2007)
In re the Interest of K.M.C., III.
No. 28013.
Missouri Court of Appeals, Southern District, Division Two.
May 31, 2007.
*918 Teresa Rieger Housholder, Marshfield, for Appellant.
William C. Prince, Springfield, for Respondent.
Larry Brent Moore, Springfield, for Juvenile/Minor.
JEFFREY W. BATES, Chief Judge.
G.C.S. (Mother) appeals from a judgment terminating her parental rights to her son, K.M.C., III (K.M.C.).[1] The trial court terminated Mother's parental rights pursuant to § 211.447.4(2) for abuse or neglect and pursuant to § 211.447.4(3) for failure to rectify harmful conditions.[2] On appeal, Mother presents three points: (1) there was insufficient evidence to support termination on the statutory abuse or neglect ground; (2) there was insufficient evidence to support termination on the statutory failure to rectify ground; and (3) the court failed to make sufficient findings to support its decision that termination of Mother's parental rights was in K.M.C.'s best interest. We affirm.

*919 I. Factual and Procedural Background
When we review a trial court's judgment terminating parental rights, we consider the facts and the reasonable inferences derived therefrom in a light most favorable to the judgment. In re L.R.S., 213 S.W.3d 161, 164 (Mo.App.2007); In re L.M., 212 S.W.3d 177, 180 (Mo.App.2007). Viewed in that light, the following evidence was adduced at the termination hearing.
K.M.C. was born March 4, 1997 in Springfield, Missouri. At that time, Mother and K.M.C., II (Father), were married and residing together. By mid-June 2001, the couple had separated. Father continued to reside in the family home. Mother moved out, but she returned daily to babysit K.M.C. and the other children in the home.
On June 19, 2001, Mother was watching the children as she usually did. Father was not at home. Mother left a 16-year-old niece in charge of watching the children while Mother took a shower and applied her makeup. During that time, K.M.C. apparently climbed out of a bedroom window and left the house. When Father returned home, he discovered that K.M.C. was missing. Mother called the police and reported that K.M.C. was missing. He was found by police about five blocks away.
The Division was notified of the incident, and case investigator Emilie McPhail (McPhail) met with Mother and Father at their home. McPhail found probable cause to believe that Mother had failed to properly supervise K.M.C. While there, McPhail established a safety plan requiring the parents to be in continuous visual contact with K.M.C. and ensure that he remained at "arm's length" at all times. Before McPhail left the home, however, she observed K.M.C. leave the room without supervision. Since Mother and Father were not taking the matter seriously, McPhail contacted the Juvenile Office and had K.M.C. taken into protective custody. Eventually, K.M.C. was returned to Father's custody.
On May 14, 2003, the Division received another hotline report concerning K.M.C. Then age six, he had started a fire in the upstairs bedroom that killed his two-year-old brother, B.C.K.M.C. had been in Father's custody since his parents' divorce. Due to strained relations with Father and his new spouse, Mother had not seen K.M.C. for several months. The Division's investigation resulted in a finding of probable cause to believe that Father had failed to properly supervise K.M.C.
After the fire, Mother and Father attended a conference at the Greene County Juvenile Office. They each acknowledged K.M.C.'s need for mental health treatment and voluntarily placed him into the Division's legal and physical custody. K.M.C. was subsequently admitted to Lakeland Regional Hospital for treatment.
On May 23, 2003, a petition alleging neglect by both Father and Mother was filed by the Greene County Deputy Juvenile Officer. The petition alleged that Mother had "a history of being unable and/or unwilling to provide adequate supervision" for K.M.C. and that K.M.C. was "unable to remain within the parental home due to his need for mental health treatment."
On December 8, 2003, a jurisdictional and dispositional hearing was held. The trial court found that the allegations relating to Mother were true. In addition, the court found Mother "is currently without independent housing, or stable income. She has been referred to Burrell for mental health services." The court further found K.M.C. in "need of additional mental health treatment before reunification can *920 occur" and ordered the child to remain in the continuing temporary legal and physical custody of the Division.
Dr. Evelyn Darrow (Dr. Darrow), a licensed psychologist, first evaluated K.M.C.'s cognitive and emotional condition on August 20, 2003. K.M.C. had come from "an environment that was not very enriched." His scores on the WISC-III revealed an I.Q. of 69, which showed mild mental retardation. Although the child was six years and five months old, his scores and verbal skills were in the two-year-old to three-year-old range. Dr. Darrow diagnosed K.M.C. with post-traumatic stress disorder (PTSD), oppositional defiant disorder, severe attention-deficit hyperactivity disorder (ADHD) with marked impulsivity, an impulse control disorder, an unspecified learning disorder and "neglect of a child" based on lack of parental supervision in the 2001 incident when K.M.C. wandered away from home and in the 2003 incident when he set the fire that killed B.C. Given K.M.C.'s condition, Dr. Darrow did not recommend returning him to the family home. Instead, he needed an environment that was more enriched, stable and structured and that provided him with "constant supervision."
While K.M.C. was in the Division's custody and receiving mental health treatment, the Division prepared a treatment plan for Mother. The plan was intended to address the problems created by Mother's unstable housing, unstable employment, mental health issues and deficient parenting skills.
Mother completely failed to comply with the treatment plan's requirement that she maintain a stable residence. When the Division took custody of K.M.C., Mother was residing with a relative of her new husband, E.S. (Husband). In September 2003, Mother moved in with a family friend. In October 2003, Mother and Husband moved back in with his relatives. In November 2003, Mother moved back in with the family friend. In January 2004, Mother obtained a house on State Street in Springfield. Mother lost that house. In July 2004, Mother moved in with friends. In September 2004, Mother moved into the home of Husband's brother. The brother subsequently moved out, and Mother was able to reside in the home rent free. Mother was unable to maintain that residence and moved into another home. Mother remained there until May 2005 when she moved into the Missouri Hotel. Mother was evicted from the Missouri Hotel due to lack of cooperation with her caseworker and her failure to do her required work at the hotel. In August 2005, Mother briefly resided at a motel. On August 11, 2005, Mother moved in with an alleged child abuser in Seymour, Missouri. Mother then moved back to Springfield, where she lived part of the time with Husband's relatives and part of the time at the Missouri Hotel.
Between 2003 and 2006, Mother was intermittently employed. When K.M.C. was first taken into the Division's custody, Mother worked at a nursing home. After that employment ended, Mother worked at temporary jobs through Penmac placements. Mother did not regularly provide the Division with verification of her employment as required. During K.M.C.'s placement with the Division, Mother did not provide any monetary support of K.M.C. She did contribute a few items of in-kind support such as socks, shoes and a backpack.
Over the same three-year time span, Mother was provided with numerous services in an effort to address problems involving her mental health and parenting skills. In 2003, Mother completed a psychological evaluation and was referred for individual counseling. Initially, Mother *921 was seen by Cheryl Johnson. This therapy ceased because Mother failed to attend scheduled appointments.
Next, Mother was referred to Mindy Ellis (Ellis) for counseling. From the fall of 2003 through the fall of 2005, Mother attended counseling intermittently. There were "continual attendance issues" with Mother, and this service was finally terminated due to Mother's failure to regularly attend the counseling sessions. When Ellis began working with Mother, she was "acutely psychotic." Mother would become enraged, aggressive and assaultive toward others. After commencing a regimen of psychotropic medication, Mother's mental health eventually stabilized after approximately one year. Ellis then began to work with Mother on depression and parenting issues created by K.M.C.'s special needs. Mother lacked the ability to effectively parent K.M.C. due to Mother's chaotic lifestyle, lack of stable transportation, recurring criminal charges and involvement in an abusive and violent relationship with Husband.
By January 2005, the Division had initiated a permissive placement of K.M.C. with Mother. From January 7, 2005 through April 15, 2005, Mother was provided with seven hours per week of intensive family reunification services in her home. Mother had married Husband, and he was in the home during that period of time. In September 2005, the Division terminated K.M.C.'s permissive placement for three reasons. First, the Division received a new hotline report that Mother spanked K.M.C. and left bruises. Second, Mother failed to bring K.M.C. to more than half of his scheduled therapy sessions and failed to schedule further appointments as required. Third, there was continuing instability in Mother's life, as evidenced by her lack of stable housing, domestic violence against Mother and K.M.C. by Husband, and Mother's decision to move into the residence of another male who had been arrested for child abuse.[3] After revocation of the permissive placement, Mother's visits with K.M.C. became sporadic.
Between November 2005 and May 2006, the Division provided Mother with the opportunity to participate in a weekly family therapy session with psychologist Karla Huhn (Huhn). Mother's initial attendance was good, but this service was discontinued in May 2006 after Mother had missed 16 weekly therapy sessions. Because Mother lacked stable housing or employment, had spent time in jail and was facing criminal charges, Huhn opined that Mother did not have the ability to appropriately parent K.M.C.
Ellis also enrolled Mother and Husband in a parenting class. This program consisted of seven, successive weekly sessions of 90 minutes each. Mother and Husband attended one weekly session in May 2006. Then, Mother was arrested on an outstanding warrant. She never returned for any additional sessions or asked to be re-enrolled in the program during a subsequent seven-week term.
Dr. Darrow performed a second psychological evaluation of K.M.C. on April 26, 2006. Based on this second evaluation, Dr. Darrow's diagnoses of K.M.C. included PTSD, oppositional defiant disorder, *922 ADHD with marked impulsivity and neglect of a child. Testing showed that K.M.C. was still mildly mentally retarded. During the nearly three years that had elapsed between evaluations, however, K.M.C. had made "significant cognitive gains." He had overcome many of his language issues, expanded his vocabulary and improved his ability to communicate. One factor that contributed to K.M.C.'s tremendous improvement was his placement in a therapeutic foster home. In such a home, the foster parents are specially trained to coordinate with mental health professionals and teachers to provide structured and consistent care. When K.M.C. went for visits with Mother, however, the child's behaviors would regress for several days. Therefore, Dr. Darrow recommended that such visits cease. She also opined that K.M.C. needed a "totally stable, secure, consistent" environment that would let him develop further and benefit from ongoing therapies. If K.M.C. was placed in an unstructured environment, there would be an immediate regression and escalation of his negative behaviors.
Psychologist Huhn had provided K.M.C. with individual therapy, from December 2004 through July 2006. Comments that K.M.C. made to Huhn during their sessions led Huhn to believe that K.M.C. suffered from a condition known as parentification.[4] Huhn agreed with the view that what K.M.C. needed was "a very stable environment that's able to provide consistent discipline and support, and a place in which he's allowed to be the child and be provided with structure and routine, and with appropriate adults who are able to support him in that role." Huhn opined that K.M.C. needed to regularly and consistently continue to receive individual therapy for the foreseeable future.
On February 28, 2006, a petition to terminate Mother's parental rights was filed by the Greene County Juvenile Officer. The trial on the petition was conducted on July 14, 2006. The trial court terminated Mother's parental rights pursuant to § 211.447.4(2) for abuse or neglect and pursuant to § 211.447.4(3) for failure to rectify harmful conditions. The court also made specific findings under § 211.447.6 and determined that termination of Mother's parental rights was in K.M.C.'s best interest. This appeal followed.

II. Standard of Review
To terminate parental rights, a trial court must use a two-step analysis. In re S.J.H., 124 S.W.3d 63, 66 (Mo.App. 2004). In the first step, the court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exist. § 211.447.5; In re P.L.O., 131 S.W.3d 782, 788 (Mo. banc 2004). "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). This standard of proof may be satisfied even though the court has contrary evidence before it or the evidence might support a different conclusion. In re A.K.F., 164 S.W.3d 149, 151 n. 1 (Mo. App.2005). After finding one or more statutory grounds for termination have been proven, the trial court then moves to the second step and must determine, by a *923 preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.5; P.L.O., 131 S.W.3d at 789; S.J.H., 124 S.W.3d at 66.
On appeal, we review a trial court's decision that one or more statutory grounds for termination exist to determine whether the ruling is supported by substantial evidence, is against the weight of the evidence, or involves an erroneous application or declaration of the law. S.M.H., 160 S.W.3d at 362. We will not reverse the trial court's decision unless we are left with the firm belief that the decision was wrong. Id. Conflicting evidence will be reviewed in the light most favorable to the judgment of the trial court. In re A.S.W., 137 S.W.3d 448, 452-53 (Mo. banc 2004). We defer to the trial court's assessment of witness credibility. In re C.F.C., 156 S.W.3d 422, 426 (Mo.App.2005). We use an abuse of discretion standard to review a trial court's decision that termination of parental rights is in the child's best interest. In re B.J.K., 197 S.W.3d 237, 243 (Mo.App.2006).

III. Discussion and Decision
In Mother's first point, she contends that termination of her parental rights pursuant to § 211.447.4(2) was erroneous because there was insufficient evidence to prove abuse or neglect. Before addressing Mother's arguments, a brief review of the relevant statutory framework is helpful.
Section 211.447.4(2) authorizes a court to terminate parental rights if "[t]he child has been abused or neglected." This subsection of the statute also states:
In determining whether to terminate parental rights pursuant to this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:
(a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development[.]
§ 211.447.4(2)(a)-(d). These four factors are simply categories of evidence to be considered along with other relevant evidence, rather than separate grounds for termination in and of themselves. See In re L.M., 212 S.W.3d 177, 182 (Mo.App. 2007). Nevertheless, proof of one such factor is sufficient to support termination on the statutory abuse or neglect ground. See In re A.S.O., 75 S.W.3d 905, 912-13 (Mo.App.2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000).
*924 In the case at bar, the trial court considered and made findings as to all four factors relevant to the statutory abuse or neglect ground for termination. As to factor (a), the court found that Mother's mental condition was amendable to treatment. The court did not rely upon factor (b) because there was no evidence showing its applicability. As to factor (c), the court only found that Mother "spanked the minor child leaving bruises." Therefore, factor (d) appears to have been determinative. The court found that Mother neglected K.M.C. through the "[r]epeated or continuous failure by the parent, although physically and financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental or emotional health and development." The court based its finding upon the following:
As to the mother, the evidence presented established that the mother had a history of neglecting the needs of the minor child. The child was removed from the mother's care, custody and control following a substantiated hotline report of the mother's failure to supervise the child. That removal occurred following several prior similar hotline reports. [McPhail] testified that at the time of the 2001 removal she attempt[ed] to maintain the child in the home by preparing a safety plan designed to ensure proper supervision. [McPhail] testified that before she could even leave the home the plan was violated after the parents again failed to supervise the child. The child was subsequently returned to the care custody and control of the father. Following a fire and tragic death of a sibling, the child was placed back into protective custody and foster care. The child was in the care of the father at the time of the second placement. Between the closure of the 2001 case and the child's subsequent placement back into foster care, the evidence presented established that the mother did not support or maintain a consistent relationship with the child. Following the removal in December of 2003, the mother came forward and requested to be a placement of the minor child. The Court heard evidence from Dr. Darrow, Dr. Huhn and Mindy Ellis, mental health professionals who worked with the child. The evidence from the mental health providers established that the minor child was functioning in the mildly mentally retarded range and had a number of other mental health issues including post-traumatic stress disorder and ADHD. All of the providers testified that to prevent further emotional harm to the child, the minor [child] would need to be placed into a structured, stable and consistent home environment where his emotional needs could be met. The evidence presented established that in December of 2004 it was believed that the mother had made sufficient progress to justify a permissive placement of the child with her. The permissive placement lasted until September of 2005. The Family Reunification program was put into place at the time of the child's placement back into the mother's home. That program lasted until approximately April 15, 2005. Between December of 2004 and September of 2005, the mother did not maintain stable housing as she moved with the child from home to home. She also lived in two hotels and in a residence in Webster County, Missouri with a male individual who had a history of sexual abuse toward children. The child was removed from the mother's care at that time due [to] a hotline report that she had subjected the child to physical abuse resulting in bruising. During the *925 time the child was physically placed with his mother, the mother was not consistent in taking the child to his therapy appointments. All mental health professionals involved with the child opined that the child was in need of regular therapy. During the permissive placement the mother was unable to provide the child with a stable and appropriate home environment. Subsequent to the termination of the permissive placement, the mother continued to maintain a chaotic and nomadic lifestyle, never obtaining a stable and independent residence. At the time of the hearing, [Division alternative care worker] Cindy Hallam could not testify for sure as to the mother's current residence due to the frequent moves of the mother. Subsequent to the termination of the permissive placement the mother provided no financial support and provided limited in-kind support. There was evidence that the mother had been employed and was, therefore, able to provide at least minimal financial support for the child.
With this review completed, we move to Mother's specific arguments.
First, Mother argues there was insufficient evidence of a severe act or recurrent acts of physical abuse toward K.M.C. under § 211.447.4(2)(c). To support this assertion, Mother points to the court's finding that she "spanked the minor child leaving bruises" and argues the single incident is insufficient to terminate her parental rights. Her argument is misdirected because the trial court did not rely upon § 211.447.4(2)(c) as a factor supporting termination of Mother's parental rights. Instead, the court relied upon § 211.447.4(2)(d). Proof of this one factor alone is sufficient to support termination. See In re A.S.O., 75 S.W.3d 905, 912-13 (Mo.App.2002); In re N.M.J., 24 S.W.3d 771, 778 (Mo.App.2000). For the reasons set out below, we conclude that there was sufficient evidence to support the trial court's finding as to factor (d). Accordingly, Mother's first argument has no merit.
Second, Mother argues there was insufficient evidence that she repeatedly or continuously failed to provide K.M.C. with adequate food, clothing, shelter or other care and control necessary for his health and development. To support this argument, Mother generally relies upon evidence favorable to her and minimizes unfavorable evidence. Specifically, Mother first asserts she was not to blame in the 2001 and 2003 hotline incidents because either her niece or Father was responsible for K.M.C.'s care and control. Next, she asserts that, to the extent she was in control, the Division recommended permissive placement despite already knowing of her "chaotic and nomadic" lifestyle, failure to consistently attend therapy sessions, and failure to provide support. Mother's assertions are not persuasive.
"Courts define neglect as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." In Interest of C.L.W., 115 S.W.3d 354, 358 (Mo.App.2003); In re J.L.F., 99 S.W.3d 15, 19-20 (Mo.App.2003). In addition, "neglect is described as the failure to perform the duty with which a parent is charged by law and conscience." C.L.W., 115 S.W.3d at 358.
Here, the evidence overwhelmingly supports the conclusion that Mother neglected K.M.C. Despite K.M.C.'s special needs for stability and routine, Mother repeatedly and continuously failed to provide a stable and safe home for him. Following K.M.C.'s placement in the Division's custody, Mother resided in approximately *926 14 different locations including a motel, hotel, homes of friends and relatives, and the home of a male who had a history of abusing children. Even during K.M.C.'s permissive placement with her, Mother continued in her unstable lifestyle characterized by her frequent moves and association with males who abused her or allegedly abused other children. See C.L.W., 115 S.W.3d at 358 (neglect includes failure to maintain stable environment for the safe return of the child); J.L.F., 99 S.W.3d at 20 (failure to maintain stable residences or lifestyle); In re A.H., 9 S.W.3d 56, 61 (Mo.App.2000) (housing situation extremely unstable when child needed stability as early as possible). Further, Mother failed to bring K.M.C. to many scheduled therapy appointments and failed to even make necessary future appointments. See, e.g., In re J.L.M., 64 S.W.3d 923, 925-26 (Mo.App. 2002) (parent's refusal to recognize seriousness of child's health conditions is evidence of lack of commitment toward the child). Although employed, Mother also failed to contribute any support for K.M.C. While the Division did not demand that Mother support her child, "a parent's duty to support the parent's child does not abate while the child is in the custody of [the Division]." A.H., 9 S.W.3d at 60; C.L.W., 115 S.W.3d at 358 n. 4. These facts, standing alone, demonstrate that Mother failed to provide the care necessary for K.M.C.'s well-being. C.L.W., 115 S.W.3d at 358; J.L.F., 99 S.W.3d at 20. The trial court's finding of neglect is supported by clear, cogent and convincing evidence. Accordingly, Mother's second argument also lacks merit and Point I is denied.[5]
In her second point, Mother contends the termination of her parental rights pursuant to § 211.447.4(3) was erroneous because there was insufficient evidence to support the statutory failure to rectify ground. When a trial court finds multiple statutory bases to terminate a parent's rights, we need only determine that one of the statutory grounds was proven in order to affirm the judgment. In re L.A.M.R., 179 S.W.3d 418, 419 (Mo. App.2005). Because the trial court's decision to terminate Mother's parental rights pursuant to § 211.447.4(2) on the abuse or neglect ground was supported by the evidence, Point II is moot. Therefore, we will not address Mother's claim of error relating to the sufficiency of the evidence to support the failure to rectify ground. See In re L.M., 212 S.W.3d 177, 181 (Mo. App.2007).
In Mother's third point, she contends the trial court failed to make "specific and sufficient" findings to support the court's determination that termination of her parental rights was in K.M.C.'s best interest as required under § 211.447.6. Mother did not file a motion to amend the judgment alleging the court's failure to make statutorily required findings. Rule 78.07(c) specifically provides that "[i]n all cases, allegations of error relating to . . . the failure to make statutorily required findings, must be raised in a motion to amend the judgment in order to be preserved for appellate review." Id.; In re Holland, 203 S.W.3d 295, 302 (Mo.App. 2006); see In re C.K., 221 S.W.3d 467, 469 (Mo.App., 2007); In re M.D.D., Jr., 219 S.W.3d 873, 876 (Mo.App. S.D., 2007). Because the issue is unpreserved, we will not *927 address Mother's argument relating to insufficient findings under Point III.[6]
The judgment of the trial court is affirmed.
BARNEY, and LYNCH, JJ., Concur.
NOTES
[1] The parental rights of K.M.C.'s legal father, K.M.C., II, had already been terminated with his consent and are not at issue in this appeal. The judgment also terminated the parental rights of K.M.C.'s alleged biological father and any unknown biological father. Neither has appealed.
[2] All references to statutes are to RSMo (2000), and all references to rules are to the Missouri Court Rules (2007).
[3] During the permissive placement, Mother attended a counseling session with Ellis. At that session, Mother reported that K.M.C. and she had both been abused by Husband. Mother recounted that Husband "forced [K.M.C.] to eat a cigarette, after [Husband] had left cigarettes and a lighter laying where . . . [K.M.C.] could reach that." When Mother confronted [Husband] about the incident, they started fighting. Husband "hit her against a truck, and she fell and hit her head on the concrete." When Mother awoke, K.M.C. was crying and pleading with her not to die.
[4] Parentification involves a situation in which the parent/child rules are blurred, and the child feels responsible for taking care of his or her parent. Because K.M.C. felt responsible for Mother's care, he was unable to feel that he ought to be cared for as a child himself.
[5] In the argument portion of Mother's brief, she also contends the court committed an error relating to the investigation and social study required under § 211.455. "Arguments raised only in the argument portion of the brief and not included in the point relied on are not preserved for appeal." Kierst v. D.D.H., 965 S.W.2d 932, 939 n. 4 (Mo.App. 1998); Rule 84.04; see State v. Douglas, 132 S.W.3d 251, 258 n. 5 (Mo.App.2004).
[6] Mother goes on to argue that certain findings that the court did make regarding K.M.C.'s best interest are not supported by sufficient evidence. Because Mother did not include this claim of error in her point relied on, it similarly is not preserved for our review. See n. 5, supra. Nevertheless, we have reviewed, ex gratia, the entire record and find that the trial court's best-interest determination is supported by the preponderance of the evidence and was not an abuse of discretion. In re L.M., 212 S.W.3d 177, 187 (Mo.App. 2007); see In re Holland, 203 S.W.3d 295, 302 (Mo.App.2006); see also In re J.L.F., 99 S.W.3d 15, 21 (Mo.App.2003).