246 S.W.3d 537 (2008)
In the Interest of K.A.C. (DOB: 07-18-03), a Child Under Seventeen Years of Age.
No. 28489.
Missouri Court of Appeals, Southern District, Division II.
February 29, 2008.
*539 Larry Moore, Springfield, MO, for Appellant.
William Prince and Roger Owensby, Springfield, MO, for Respondent.
DON E. BURRELL, Judge.
N.C. (Mother) appeals the judgment terminating her parental rights over her daughter, K.A.C. (Daughter), born July 18, 2003. In her sole point on appeal, Mother alleges there was insufficient evidence to support a termination of her parental rights based on grounds of either abuse/neglect or failure to rectify. We affirm.

Background
In April of 2005, the Juvenile Office of Greene County (Juvenile Office) filed its petition seeking to terminate the parental rights of Mother over Daughter. In October of 2005, the Juvenile Office filed an amended petition that also sought to terminate C.C.'s (Father) parental rights over Daughter. On March 26, 2007, a judge of the Thirty-First Judicial Circuit, Juvenile Division (Juvenile Court), entered a judgment which terminated both parents' parental rights.
This case has a considerable history. In all, the child at issue was in alternative care for more than three-and-a-half years before parental rights were eventually terminated. The Juvenile Office first became involved with this family when a member of the Greene County Children's Division (the Division) conducted a newborn crisis *540 assessment at the time of Daughter's birth in July of 2003. The assessment was initiated when someone reported to the Division that either Mother or Daughter had tested positive on a drug screen administered at the time of the child's birth. After its investigation, the Division determined that the positive result was due, at least in part, to some of the drugs given to Mother at the hospital and eventually concluded that the family did not need to participate in any Division referred services in order to properly care for the child.
Two months later, Mother voluntarily placed Daughter into the Division's care because of concerns she had about domestic violence that was occurring in her home. Mother was also having difficulty dealing with grief she was experiencing over the loss of a sibling to Daughter who had previously passed away from Sudden Infant Death Syndrome (SIDS). After Mother placed Daughter with the Division, she and the child's father were referred to Theresa Schulz (Schulz) for counseling services. This counseling was part of an overall program set up by the Division to help the family deal with depression, strengthen their parenting skills, and eliminate domestic violence from the home. These were the issues that the Division believed would need to be successfully addressed before Daughter could be placed back into the parents' home.
By June of 2004 (eight months after the voluntary placement), Mother and Father were believed to have made significant progress on these issues and the Division was ready to recommend that Daughter be placed back in their home. Although the Division was now ready to return the child to the parents, that placement was not actually made because Daughter had recently been sick enough to be hospitalized and Mother "got scared and did not want to be with [Daughter] alone." The timing of a return was also complicated by the fact that Mother was pregnant again and about to give birth. Based on the combination of these factors, the Division decided not to place Daughter back into the home until after Mother's new child was born. Because her pregnancy was classified as "high-risk" and another of her children had previously died of SIDS, Mother was also going to be required to have a home health care nurse in the house immediately following the new child's birth.
In July of 2004, Mother gave birth to a son. At the time of the newborn's delivery, another drug screen was done by the hospital and Mother tested positive for THC, the active ingredient in marijuana. This positive test result caused the Division to conduct another newborn crisis assessment. As a part of that assessment, Father was asked to submit to drug testing. He agreed to do so and his results also came back positive for THC. When Mother was released from the hospital, she refused to allow the home health care nurse into the home. An additional complication arose when, shortly after the new child was born, criminal charges were brought against Mother for felony stealing and against Father for felony stealing, unlawful use of a weapon, and "domestic disturbance." Based on both parents' positive drug tests, the pending criminal charges, and the Mother's refusal to allow the home health care nurse into the home, the Division made the decision not only to keep Daughter in alternative care, but also to recommend that the newborn be removed from the parents' care as well.
After the newborn was also taken from them, the parents' level of cooperation with the Division rapidly diminished. Mother and Father were referred to family drug court but chose not to attend. They also began refusing to allow the Division *541 to visit their home. It was at this point that the Division changed its case goal recommendation from reunification to termination of parental rights. Despite that change of recommendation, the Division continued to offer services to the family in an attempt to help the parents correct the problems that had led to the removal of their newborn and to Daughter's continuing placement in alternative care.
Mother was eventually arrested and charged with drug trafficking. Around October of 2004, Mother submitted to another drug test and again tested positive for THC. A Division worker attempting to conduct a home visit during this time period was not allowed to go beyond the living room of the home and Mother refused to speak with the worker at all on this occasion.
In November of 2004, Mother tested positive again for marijuana. Shortly thereafter, the parents' newborn son died while in the Division's custody. At this point, the parents' cooperation with the Division lessened even further and the Division stopped contracting with Schulz to provide counseling for them. Schulz, however, continued to offer counseling services to Mother and Father on her own initiative. Mother continued her counseling with Schultz but Father stopped seeing her in January of 2005. Mother and Father subsequently began living in separate residences.
From December of 2004 to April of 2005, Mother was asked by the Division to take several additional drug tests. Although Mother told the Division that she was taking the tests and they were coming up negative, the Division later determined that Mother had not actually taken any of those tests. When confronted about her failure to take the tests, Mother would become upset and refuse to communicate with the Division.
Due to her pending criminal drug trafficking charges, her continuing substance abuse, and the instability within Mother's household, the Division determined that Mother was not going to be a viable candidate for reunification. Meanwhile, Father had been making progress on his parental treatment plan and the Division informed him that he was now the parent with the best chance to regain custody of his daughter. It was at this point that Mother contacted the Division on her own initiative and informed them that she was the parent who was continuing to work on her treatment plan whereas Father was using multiple illegal substances and physically abusing her. After Mother made this report, Father was arrested for domestic violence. Mother's accusations against Father were eventually determined to be unfounded and, in March of 2005, the Division began discussing the possibility of reunifying Daughter with Father if he would take a drug test and enter a program where random drug tests would be required. Father took the requested drug test and entered a qualifying drug treatment program. In May of 2005, Mother again contacted the Division and claimed that, unbeknownst to the Division, Father had been letting her see Daughter without the Division's knowledge or approval. Mother also claimed that she and Father had begun dating again and that Father was drinking alcohol to the point where Mother was concerned for Daughter's safety. The Division initially gave credence to Mother's new allegations because she had provided the Division with details of phone conversations that Division employees had had with Father. Father denied the accusations, but would not cooperate with the Division's investigation of them. The Division later determined that, once again, Mother had lied to them and *542 that she had learned the details she had conveyed by spying on Father from a location outside his home and by eavesdropping on Father's phone calls. The Division subsequently lost contact with Father and returned to its recommendation that the court terminate the parental rights of both parents.
During this same time period, Schulz stopped offering counseling services to Mother. When Mother refused to answer certain questions, Schulz determined that Mother had not been truthful with her and that she had only wanted to use Schultz as a source of money and a place to stay. Mother later told Schulz that she (Schultz) was "not her mother" and shouldn't be telling her what to do.
Starting in December of 2005, Mother only visited Daughter sporadically. In April of 2006, Mother was convicted of two counts of the felony of trafficking drugs in the first degree, violations of Section 195.222,[1] and one count of felony distribution of a controlled substance near a school, a violation of Section 195.214.[2] From April to July of 2006, Mother was in jail awaiting sentencing on her drug trafficking convictions. When Mother was eventually sentenced, she received three twelve-year sentences which were to run concurrently and were executed under Section 559.115. The execution of her sentence pursuant to Section 559.115 allowed her to be placed on probation after completing a 120 day institutional treatment program within the Department of Corrections.
After successfully completing the 120 day treatment program in November of 2006, Mother was released from the Department of Corrections and placed on supervised probation. Once on probation, Mother asked the Division if she could start seeing her daughter again. The Division declined that request based on Mother's previous inconsistent visitation with Daughter and the pending termination of parental rights hearing.
In February of 2007, Mother admitted to her probation officer that she was continuing to use marijuana on an almost daily basis. Her probation officer subsequently filed a field violation report with the judge responsible for her criminal case which indicated the admitted drug use along with three other alleged violations: 1) association with another felon; 2) association with someone who had been convicted of a misdemeanor; and 3) failure to report. After a hearing on the alleged probation violations, the judge with jurisdiction over Mother's criminal case revoked her probation and executed the remainder of her twelve year sentence. Shortly thereafter, the Juvenile Court entered its judgment terminating Mother's parental rights over Daughter.

Issue on Appeal
Mother raises one point on appeal. She claims that the Juvenile Court erred in terminating her parental rights because there was insufficient evidence to prove that she had abandoned and neglected Daughter and that insufficient evidence existed to prove that the conditions which led to the original assumption of jurisdiction over Daughter in 2003 still persisted or that conditions of a potentially harmful nature continued to exist.

*543 Standard of Review

A two-step analysis applies when a trial court terminates parental rights. In re K.M.C., III, 223 S.W.3d 916, 922 (Mo.App. S.D.2007). Initially, the court must find that clear, cogent, and convincing evidence exists that one or more statutory grounds for termination exist. Id.; Section 211.447.5. "Clear, cogent, and convincing evidence is evidence that instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." In re S.M.H., 160 S.W.3d 355, 362 (Mo. banc 2005). "The presence of evidence to support one statutory ground for termination is sufficient to terminate a parent's rights." Id. After a trial court has determined that one of the statutory grounds for termination exists, the court then moves on to the second step and must determine whether, by a preponderance of the evidence, the termination will be in the child's best interest. Section 211.447.5; In re K.M.C., III, 223 S.W.3d at 922-23. The trial court's decision in the second step is reviewed for abuse of discretion. In re C.A.L., 228 S.W.3d 66, 70-71 (Mo.App. S.D.2007).
On appeal, this Court will affirm the trial court's termination of parental rights unless there exists no substantial evidence to support the decision, the trial court erroneously declared or applied the law, or the decision is against the weight of the evidence. In re S.M.H., 160 S.W.3d at 362; Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's decision will not be reversed unless we are left with the firm impression that the decision was incorrect. In re S.M.H., 160 S.W.3d at 362. Conflicting evidence is viewed in the light most favorable to the trial court's decision and we defer to the trial court's assessment of witness credibility. Id.; In re K.M.C. III, 223 S.W.3d at 923.

Analysis
The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing. In re A.M.F., 140 S.W.3d 201, 205 (Mo.App. S.D.2004). The power of Missouri courts to terminate parental rights did not exist at common law and the statutes that grant such authority must be strictly and literally complied with. Interest of K.T.K. v. Crawford County Juvenile Office, 229 S.W.3d 196, 200 (Mo.App. S.D.2007); In re N.M.J., 24 S.W.3d 771, 781 (Mo.App. W.D.2000).
The Juvenile Court found that, under Section 211.447.4(2), Daughter had been abused and/or neglected (abuse/neglect) and, under Section 211.447.4(3), Daughter had been under the jurisdiction of the juvenile court for a period of one year and that the conditions which led to the assumption of that jurisdiction still existed (failure to rectify). Section 211.447.5 provides that a petition to terminate parental rights may be granted if the trial court finds that "the termination is in the best interest of the child and when it appears by clear, cogent, and convincing evidence that grounds exist for termination pursuant to subsection 2, 3 or 4 of this section." As previously related, Mother alleges that there was insufficient evidence to support the Juvenile Court's finding that grounds existed either on the basis of abuse/neglect or on failure to rectify.[3] When a trial court relies on multiple statutory grounds for terminating parental *544 rights, the order may be affirmed if any of the grounds is supported by clear, cogent, and convincing evidence. In re L.M., 212 S.W.3d 177, 181(Mo.App. S.D.2007). Because we find grounds for termination existed for failure to rectify under Section 211.447.4(3), we need not reach Mother's claim that the trial court erred in finding grounds to terminate for abuse/neglect under Section 211.447.4(2).

Failure to Rectify
Under Section 211.447.4(3), a court may terminate parental rights when
The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:
(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;
(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;
(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

a. Chemical Dependency
While the Juvenile Court found that Mother did not suffer from an untreatable chemical dependency, it also found that Mother's use of controlled substances contributed to the conditions that had kept Daughter in the Division's care since 2003. It also noted that Mother's almost daily use of marijuana contributed to the revocation of her probation and the resulting execution of her prison sentence. Over the period of time in question, Mother failed three drug tests and lied about having taken and passed several others when she had not. Mother had used marijuana while pregnant with her son and later admitted to using marijuana on an almost daily basis.
Mother originally voluntarily placed Daughter into the Division's care because of concerns she had over Daughter's safety and her ability to appropriately care for Daughter. Since that time, Mother has continued to engage in a lifestyle characterized by crime and drug usage. Her volitional criminal conduct and continuing illegal drug usage resulted in her initial conviction for trafficking drugs near a school and the subsequent revocation of her probation. Mother was jailed for close to seven months in 2006. She participated in a 120 day drug treatment program at the Department of Corrections but resumed her illegal drug usage shortly after *545 leaving that program. Due to her continuing illegal drug usage and inability to follow the terms of her probation, Mother has once again been incarcerated and must now serve the remainder of her twelve year sentence. It is clear from the record that Mother continues to engage in illegal drug usage on an almost daily basis and that this usage has contributed to her inability to provide a stable, safe home environment for Daughter.

b. Success or Failure of Division's Efforts to Aid Mother
Viewing the entire time period between the Juvenile Court's original assumption of jurisdiction over Daughter to its termination of Mother's parental rights, it is clear that, despite the Division's efforts, Mother failed to adjust her conduct and lifestyle in order to provide a proper home for Daughter. After her drug conviction, completion of the 120 day institutional drug treatment program, and subsequent release onto probation, Mother had an opportunity to make a fresh start. With help from the Division and her probation officer, Mother could have attempted to seek and maintain gainful employment, refrain from illegal drug use, and establish a safe home environment for herself and her daughter. Instead, Mother immediately began using illegal drugs again and failed to follow the terms of either her parental treatment plan or her supervised probation.

c. Terms of Social Service Plan[4]
Treatment plans provided to parents by either court order or by the Division provide the trial court with highly relevant evidence. In re S.M.H., 160 S.W.3d at 368. A parent's efforts to meet the requirements of such a plan serve as an indication of what kind of care the parent will provide in the future. Id. In reviewing a parent's progression with a given treatment plan, the focus is on "whether progress has been made in complying with the service agreements, not whether there has been full or substantial compliance." Id. at 369.
As part of her court-ordered treatment plan, Mother was to attend counseling. Schulz, the counselor who worked with Mother on issues related to anger management, depression, family counseling, domestic violence and parenting skills, testified at trial that she felt Mother had used her and lied to her repeatedly. Ultimately, Schulz would not testify that Mother had made any progress in their counseling sessions. Numerous employees of the Division also testified that Mother did not consistently cooperate with them in working on her parenting plan and was, at times, completely uncooperative with them. Mother was not always honest with the Division about her relationship with Father or about her participation and progress in working on her treatment plan. The treatment plan also required Mother to maintain regular visitation with Daughter but, throughout 2006, her visitation with Daughter was sparse and inconsistent.
Mother was also to obtain employment or other lawful means of support. Throughout the nearly four year period at issue in this case, Mother was only occasionally employed. When she claimed employment, she often failed or refused to show any proof of it. The treatment plan also required that Mother provide a stable home environment. As the Juvenile Court noted, Mother and Father have separated and reconciled numerous times and Mother *546 has filed numerous petitions for orders of protection against Father. In the period after the Juvenile Court had originally assumed jurisdiction over Daughter, Mother spied on Father and found a way to eavesdrop on his phone calls with the Division. Domestic violence, anger management problems, and Mother's drug conviction have all led to a chaotic and unstable home life.

d. Conditions Leading to Failure to Rectify
Mother argues that, because the Division was recommending reunification in 2004 before the birth of her son, the conditions that led to the placement of Daughter into the juvenile court's jurisdiction no longer existed. In determining whether grounds for termination exist, the trial court looks to the totality of the parent's conduct both prior to and after the filing of the petition to terminate parental rights. In re K.A.W., 133 S.W.3d 1, 10 (Mo. banc 2004); In re A.S., 38 S.W.3d 478, 485 (Mo.App. S.D.2001). "All grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct." In re N.M.J., 24 S.W.3d 771, 780 (Mo.App. W.D.2000) (quoting In re T.T., 954 S.W.2d 429, 432 (Mo.App. W.D.1997)). When terminating parental rights for a failure to rectify, the trial court must rely on grounds other than those that existed when the trial court first assumed jurisdiction over the child. In re K.A.W., 133 S.W.3d at 10. The earlier findings of the trial court are not irrelevant to the issue, but must be updated to cover the period up to the time of termination and to show their potential for future harm. Id.
As Mother freely admits, reunification did not occur for several reasons. Among them was Mother's refusal to cooperate with the Division in allowing the home health care nurse into her home and her positive test for marijuana at the time of the new baby's birth. More importantly, Section 211.447.4(3) allows termination of parental rights to occur if the child has been under the jurisdiction of the juvenile court for a period of one year, "and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist . . ." (emphasis added). Even if the Juvenile Court believed that the original concerns (domestic violence and Mother's belief that she was unable to properly meet the child's needs) had been favorably resolved, Mother's use of, and involvement with, illegal drugs from some time prior to the birth of her son and up until the time of the trial on the petition to terminate parental rights constituted just such a condition of a potentially harmful nature. See In re B.L.H., 158 S.W.3d 269, 279-80 (Mo.App. E.D.2005) (overruled on other grounds). These conditions turned out to be actually harmful as well as potentially so as Mother's lengthy incarceration on her drug distribution charge will necessarily prevent Daughter from being returned to her at any time in the near future. Mother's actions demonstrated both that she had not made any real progress in working on her treatment plan and that other conditions of a potentially harmful nature had arisen and continued to exist at the time of trial.
Based on the above, we find no error in the Juvenile Court's finding that clear, cogent, and convincing evidence of statutory grounds for termination existed under 211.447(3).

Best Interest Determination
Lastly, Mother alleges that the Juvenile Court had no authority to find that the termination of Mother's parental *547 rights was in Daughter's best interests because the Juvenile Office failed to prove the allegations contained in its petition to terminate parental rights. Mother does not specifically challenge any of the findings under Section 211.447.6 relied upon by the Juvenile Court in ruling the termination to be in Daughter's best interest. It is unclear from Mother's point relied on whether she is challenging the Juvenile Court's best interest determination. However, even if this Court assumes that Mother has raised this issue in her point relied on, we find that, by failing to support her contention with argument beyond a single conclusory statement, Mother has abandoned the issue.
The failure to develop and pursue allegations of error in the argument portion of an appellant's brief constitutes a waiver of that issue. Coleman v. Gilyard, 969 S.W.2d 271, 274 (Mo.App. W.D.1998).
The judgment of the Juvenile Court is affirmed.
BARNEY, P.J., and RAHMEYER, J., concur.
NOTES
[1] All references to statutes are to RSMo (2000) unless otherwise indicated.
[2] On appeal, this Court reversed the two convictions for drug trafficking. State v. Cryderman, 230 S.W.3d 370 (Mo.App. S.D.2007). Our decision did not affect the conviction for distribution of a controlled substance near a school. Id. at 375.
[3] In her brief, Mother also claims that there was insufficient evidence to support a finding that daughter had been abandoned. However, we do not address this point as the Juvenile Court did not find that Daughter had been abandoned.
[4] We do not have the actual treatment plan before us, but gather information of its details from the testimony presented at trial and the Juvenile Court's findings.