DANIEL E. SCOTT, J.
Amy Holmes challenges a dissolution judgment that divided marital property and awarded Doug Holmes sole legal and physical custody of their young daughter.[1] Amy contends that (1) the custody award is against the weight of evidence; (2) the court did not comply with § 452.375.2; (3) the property division is not fair and equitable; and (4) the court erred in calculating child support.
Relief is merited in only one respect: a child support credit for overnight visitation. We reverse and remand to that extent and affirm the judgment otherwise.
General Principles of Review
To quote Amy’s brief, it “is well settled in Missouri that matters such as this are governed by the paramount decision in Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976),” which requires that we affirm the trial court’s judgment unless (1) no substantial evidence supports it; (2) it is against the weight of the evidence; or (3) it erroneously declares or applies the law.[2]
It is Amy’s burden to show error. McCallum v. McCallum, 128 S.W.3d 62, 66 (Mo.App.2003). “We do not retry the case, rather we accept as true the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party and disregard contradictory evidence.” Id. at 65.[3]
*601 Background
Amy married Doug in 2003. Child was born in 2006. Doug worked as an engineer. Amy kept the home and worked part-time. In April 2010, when Child was age 3, the family moved from Virginia to Missouri, temporarily living with Amy’s parents until they found a house.
Amy took Child on a trip two months later. Unbeknownst to Doug, Amy also took $41,417 from the couple’s bank accounts (leaving Doug $4-70),[4] cancelled their joint credit cards, “hotlined” a report that Doug had fondled or inappropriately touched Child, and got an ex parte order of child protection. For five months thereafter, Doug was not allowed to see or have any contact with Child.
Meanwhile, the Children’s Division (“CD”) investigated the allegations and, within a month, found them to be unsubstantiated. Amy promptly hotlined Doug again, adding allegations of oral sex and of an enlargement or stretching of Child’s vagina. Following a second forensic interview and a medical examination finding no signs of sexual abuse, the CD also found these allegations unsubstantiated.
Authorities wanted Child to live, temporarily, with a neutral relative or friend. Doug and Amy could not agree on such a person. The juvenile officer then took custody of Child, who spent the next seven weeks in foster care. The foster parent noted no sexual or inappropriate behavior by Child. During this time, according to two trial witnesses, Child “apologized for the lies about her dad” and said “I’m just tired of the lies.”
In December 2010, Doug was granted a supervised visit with Child at the CD office. Child “was elated to see him — very excited to see her daddy” and “ran right to him,” according to the CD supervisor who oversaw this “very joyful, playful, and appropriate visit,” and testified that Child acted similarly at all of Doug’s later visits.
Thereafter, authorities decided not to pursue extended judicial custody and instructed Amy and Doug to work out custody arrangements. For the next 19 months, Child stayed with Doug one week and with Amy the next.
Amy hotlined Doug yet again in March 2011, repeating allegations previously found to be unsubstantiated. The CD coded this third report “inappropriate” and closed it without further investigation.
At trial in August 2012, Amy opined that the CD “returned [Child] to a child abuser” and that Doug was still abusing Child, even to the time of trial. Amy testified that nothing could convince her otherwise, such that she even believes allegations that she knows are actually false. We quote Amy’s trial testimony:
Q. Is there anything that could be done that would convince you that Doug Holmes did not sexually abuse and is not sexually abusing your daughter?
A. I don’t know how not to believe my daughter. I don’t know how to not believe her.
Q. Even when she makes statements that he’s abused her on the trampoline, which you know is false, correct?
A. I think—
Q. Is that correct?
A. That’s correct.
Q. Even when she makes allegations that he’s abused her at the circus, which you know is false?
A. That’s correct.
[[Image here]]
*602 Q. Okay. So Doug has never been on this trampoline with [Child], right? [ 5]
A. No, he hasn’t.
Q. And so you’re aware that [Child] made allegations that Doug had abused her on the trampoline; is that correct?
A. Yes.
Q. Do you believe those allegations?
A. Yes, I do.
Q. Even though Doug has never been on the trampoline with [Child]?
A. That’s right.
Q. She’s also alleged that he abused her at a circus; is that correct?
A. That’s correct.
Q. Has Doug ever taken her to a circus?
A. No.
Q. So you believe that, too, though?
A. Yes. Doug testified that he felt Amy had coached Child to lie about child abuse, alienated Child from Doug, tried to convince others that Doug abused Child, and was likely to persist in all of these. He requested sole legal and physical custody of Child. The guardian ad litem (“GAL”) recommended likewise.[6]
In its judgment, the court found that Doug “has not abused the minor child in any way”; that Amy’s behavior prior to and at trial “raise[d] questions as to her ability to properly raise the minor child, if the child resided with her primarily”; that Doug was the parent more likely to allow Child to have frequent, continuing, and meaningful contact with the other parent; and that it was in Child’s best interest to remain in Doug’s home and school district. The court further observed that Amy
made two hot line calls, one on July 18, 2010 and one on August 12, 2010 and was involved in a third hot line call in April 2012. The first two hot line calls were extensively investigated by Children’s Division. The first hot line call was reported unsubstantiated on August 30, 2010. The second hot line call was reported unsubstantiated on December 21, 2010. The third hot line call was determined to be an inappropriate report and was not investigated. A SAFE examination was conducted on August 5, 2010 at Cardinal Glennon Children’s Hospital.... The Children’s Division, the Juvenile Office and the medical personnel that conducted the SAFE exam found no evidence of sexual abuse.
The court also cited evidence that Child was assisted or coached in connection with reports, and that there were “two physically impossible reports, i.e., the trampoline incident and the circus incident.”
Summing up, the court observed that Child “was subjected to two hot line calls, two Children’s Division investigations, two psychological evaluations, two CAC interviews, and numerous visits to counselors and therapists,” was taken to St. Louis for a SAFE exam, and had even spent time in foster care.
From the record, the minor child was subjected to significant instability, originating from [Amy’s] household. The record suggests that this instability may continue, based on [Amy’s] April 2012 inappropriate report and [Amy’s] statements at trial that she wanted [Doug’s] parental rights terminated. A stable home with a good environment is the most important consideration as to custody.
*603 The more stable home appears to be [Doug’s] and in the best interests of the minor child, [Doug] should have primary custody. [Amy] should have temporary custody and visitation as the Court deems appropriate.
The Guardian ad Litem recommends that the custodial arrangement for the child remain in Rolla with [Doug], with visitation for [Amy].
Citing all these factors, the court found it in Child’s best interest to award Doug sole legal and sole physical custody, with visitation to Amy. The judgment so ordered.
Amy was ordered to pay Doug $546 monthly child support. The court awarded the parties their respective vehicles, retirement and financial accounts, and personal property in their possession. The parties were to pay their own post-separation debts. There was no other marital debt to divide.
Amy appeals, raising four points.
Point I — Child Custody
Amy contends that the custody decision was against the weight of the evidence and that she should have sole legal and physical custody of Child.

Standard of Review

An appellate court will not disturb a custody decision unless it is manifestly wrong and the child’s welfare requires some other disposition. Marriage of Sisk, 937 S.W.2d 727, 730 (Mo.App.1996). “This court must presume the trial court awarded custody in the child’s best interests, due to the trial court’s superior position in judging the credibility of the witnesses, along with their character, sincerity, and other intangibles not completely revealed by the record.” Id. The trial court was entitled “to believe or disbelieve all, part or none of the testimony of any witness.” Id.
To reiterate, we will affirm this custody award unless we are firmly convinced that Child’s welfare demands another arrangement. Thorp v. Thorp, 390 S.W.3d 871, 877 (Mo.App.2013). “We afford greater deference to the trial court’s decision in child custody determinations than in other cases.” Sisk, 937 S.W.2d at 730.

Analysis

Amy’s Point I argument largely boils down to these assertions:
1. The record, properly weighed, proves that Doug abused Child and that she is not safe with him.[7]
2. To quote Amy directly: “The only way to reconcile the lower court’s decision in this case is to recognize that, in the heat of advocacy, it was difficult for the lower court to see the amount of fallout from Fred No-len’s involvement.”[8]
*604 Our careful consideration of the record, in accordance with our standard of review, fails to convince us of either claim.
As to # 1, Amy concedes (and, to some degree, complains) that appellate courts do not reweigh evidence in custody cases. “Regarding custody issues, we grant the trial court broad discretion and do not reweigh the evidence, even if the evidence may have supported another conclusion.” Id; see also Durbin v. Durbin, 226 S.W.3d 876, 879 (Mo.App.2007). As noted previously, we give greater deference to trial courts in custody cases than in other litigation because trial courts are better positioned to judge the parties’ credibility, sincerity, character, and other intangibles that we may be unable to glean from a cold record. See Durbin, 226 S.W.3d at 879; Sisk, 937 S.W.2d at 730. Ultimately, what was said in Durbin, id, we also say here: “We have thoroughly reviewed the record and found that, while the evidence may also have supported a contrary decision, the evidence was more than sufficient to support the trial court’s award of custody and that decision was not against the weight of the evidence.”
As to #2, Amy complains that Nolen “tainted” this case; had he not been involved, Child “would never have been placed in foster care, she would never have been taken from her Mother, and she would have been able to process what was happening to her, therapeutically, and she would have been protected from her abuser.”
Accepting that Nolen’s report was flawed — the trial court said as much in its judgment — we cannot agree that Nolen or his actions swayed the outcome. The judgment mentions Nolen twice, neither time favorably, in a single paragraph which we earlier quoted in part and now quote more fully:
The first two hot line calls were extensively investigated by Children’s Division. The first hot line call was reported unsubstantiated on August 30, 2010. The second hot line call was reported unsubstantiated on December 21, 2010. The third hot line call was determined to be an inappropriate report and was not investigated. A SAFE examination was conducted on August 5, 2010 at Cardinal Glennon Children’s Hospital. No indications of sexual abuse were reported. The Children’s Division investigation included two CAC interviews, a flawed report by Fred Nolan, and countless interviews by case workers. Substantial weight must be given to the investigation and conclusions of the Children’s Division, regardless of the value of the Nolan Report. There were no reports of sexual abuse from Petitioner’s day care provider, Respondent’s babysitters, any family physician or the foster parents. The Children’s Division, the Juvenile Office and the medical personnel that conducted the SAFE exam found no evidence of sexual abuse, [emphasis added]
Amy’s effort to pin the custody award on Nolen finds little or no support in the record and none in the judgment.[9] Her fixation with Nolen ignores investigations and conclusions of two GALs, neither of whom believed that Doug abused Child. “[I]t is significant that, even though the trial court is not bound by the recommendation of the GAL concerning custody, it was the GAL’s recommendation that Father be given primary custody of the child.” Sisk, 937 S.W.2d at 731.
Returning to basics, we find further guidance in Sisk, a case like this one in *605 several respects. There, as here, allegations of paternal sexual abuse were not substantiated. There, as here, the trial court “found that Father did not sexually abuse the child, awarded primary custody to Father and granted visitation rights to Mother.” Id. at 730. There, as here, the mother raised an “against the weight” complaint on appeal. Id. at 729. What the appellate court said there also fits here:
We do not minimize the seriousness of the allegations of sexual abuse in this or any case and have thoroughly reviewed the record. Resolution of the conflicts in evidence on this subject hinged largely on credibility. The trial court, however, is in a far better position to evaluate the credibility of witnesses than an appellate court and the resolution of conflicting evidence concerning the relative fitness of parents for custody is left to the trial court with deference to be accorded its conclusions.
Id. at 731 (quoting Marriage of Patroske, 888 S.W.2d 374, 383 (Mo.App.1994)).
Here, as in Sisk, we have carefully reviewed the record and find no abuse of discretion as to custody. Perhaps more to the point, we are not firmly convinced that Child’s welfare requires what Point I seeks: sole custody to Amy. Point denied.
Point II — Statutory Findings
Point II also challenges the custody award, urging that “the court abdicated its fact finding responsibilities, failing to comply with the best interests requirements of § 452.375, RSMo, in that [Child’s] welfare is at risk.”
Yet this is not a claim of failure to make statutory findings; Amy expressly “acknowledges the trial court set out findings relative to § 452.375.2.” The charge is inaccuracy, “that the court’s findings have numerous errors and inconsistencies relative to the evidence presented at trial.” This merely repackages Point I’s failed argument in § 452.375 terms, so we simply reiterate that the custody award is supported by substantial evidence and is not against the weight of the evidence. Point II fails.
Point III — Property Division
Amy alleges, on appeal, that she is on the short end of an 81%-19% property split. We find no error, but even if we did, Amy invited it by her own actions and requests at trial.
Amy expressly invited the trial court to credit her as having the net $31,359.45 that she had taken from joint accounts. She did so orally, on direct examination under her counsel’s questioning. She also did so in writing, in her proposed “Distribution of Assets and Liabilities” (Amy’s Exhibit C2). Crediting $31,359.45 to Amy’s side of the ledger, as she proposed at trial, puts her slightly ahead of Doug.[10] Point denied.
Point IV — Child Support
Finally, Amy asserts that her $546 monthly child support obligation “is unjust or inappropriate after consideration of all relevant factors.”[11] She argues principally that the court “failed to recognize [Doug’s] unjustified underemployment” and thus erred in not imputing higher income to him. She primarily cites Holmes v. Holmes, 878 S.W.2d 906 (Mo. *606 App.1994), which recognizes that income may be imputed
to prevent a spouse from escaping responsibilities to support minor children ... including where a spouse has: 1) voluntarily reduced his or her income without justification; and 2) involuntarily lost a job but failed to use his or her best efforts to obtain a new job, refused to accept employment offers, or failed to show that the unemployment was other than temporary.
Id. at 909 (internal cites omitted).
We presume the court did not think Doug changed careers to evade support obligations.[12] Doug testified that he lost his engineering job because stress from the accusations against him hurt his performance. Amy acknowledged that Doug previously sought engineering jobs nationwide but got only one job interview and offer. Holmes is inapposite in our view.
We cannot say the trial court abused its discretion in not imputing income to Doug or in excluding income from his sporadic secondary employment.[13] “The trial court’s inclusion or exclusion of earnings from secondary employment benefits is discretionary.” Thorp, 390 S.W.3d at 879 (citing Bridgeman v. Bridgeman 63 S.W.3d 686, 690 (Mo.App.2002)).
However, Doug concedes that Amy should have been given a Form 14, Line 11 child support credit for overnight visitation.[14] We agree, reverse the child support award in that respect only, and remand with directions to determine the appropriate credit and enter a judgment adjusting child support accordingly.
Conclusion
We reverse in part and remand the child support award as previously stated, and affirm the judgment in all other respects.[15]
NANCY STEFFEN RAHMEYER, P.J., Dissents in Separate Opinion.
WILLIAM W. FRANCIS, JR., C. J., concurs.

. Hereafter, we refer to the parties by their first names and to their daughter as “Child.” Statutory citations are to RSMo as amended through 2010. Rule references are to Missouri Court Rules 2010.

. Amy suggests that this standard may be flawed, asserting that "neither party has found a case in which the court of appeals has substantively reversed a lower court ruling related to custody in original custody awards in dissolution of marriage or paternity cases,” and that "having a standard of review that gives the impression that substantive reversal is possible may be misleading.” "Furthermore," Amy argues, “if substantive reversals on original custody determinations in the context of dissolutions or paternity actions do not occur under the 'no substantial evidence’ challenge or the ‘against the weight' challenge, the only remaining standard of review set out by Murphy is the trial court 'misstated or misapplied the law.’ ”
We decline to reexamine Murphy for several reasons. First, we are constitutionally bound to follow our supreme court’s last controlling decision. See In re X.D.G., 340 S.W.3d 607, 619 (Mo.App.2011). Second, without research at length, we find that Amy’s premise overlooks at least Kroeger-Eberhart v. Eberhart, 254 S.W.3d 38 (Mo.App.2007), and this court’s opinion in Marriage of Horinek, 41 S.W.3d 897 (Mo.App.2001). Finally, Amy questions our standard of review without proposing any change or showing how a change would alter the outcome here. Failure to develop an allegation of error by argument waives the issue. See In re K.A.C., 246 S.W.3d 537, 547 (Mo.App.2008).

.We summarize facts throughout this opinion in accordance with the last-stated principle. We decline to publish, from a record well known to the parties, any more than is needed to understand our rulings on Amy’s four points. This case is largely about unsubstantiated allegations and a child who is innocent in any event.

. Months later, when Child was in foster care, Amy sent $10,000 back to Doug.

. Amy previously testified that this trampoline was bought after she and Doug separated.

. A different GAL than was in the order of protection case.

. The dissent purports to disprove, as a proposition allegedly "necessary to sustain the judgment,” that Amy prompted Child to falsely accuse Doug of child abuse. Op. at 607. That proposition is not necessary to sustain the judgment. The correctly-framed proposition "necessary to sustain the judgment” (and subject to the four-step analysis cited by the dissent) is that the custody award is in Child’s best interest.

. The CD hired psychologist Fred Nolen (sometimes misspelled "Nolan” in the record) to evaluate Child and her parents after Amy's second hotline, and Doug called Nolen as a trial witness. Amy complains bitterly and at length that, inter alia, Nolen’s "shoddy work” unduly influenced the CD; his reports "were the basis for taking [Child] into foster care”; and "foster care had a chilling effect on [Child]’s disclosures, particularly in light of the fear that she would be taken away from her Mother, which she was, after Nolen’s reports.”

. The dissent details, at length, evidence supporting the trial court’s determination that Nolen’s work was "flawed” and to rest its custody decision on other evidence.

. $31,359.45 + 9,090.96 other property = $40,450.41. Doug received $38,828.59.

. We deem abandoned a second complaint ("no findings as to child support”) which was not developed in the argument portion of the brief. Hermann v. Heskett, 403 S.W.3d 136, 142 (Mo.App.2013).

. Neither party timely requested specific findings of fact. Fact issues with no express findings are deemed to have been resolved in accordance with the result. Marriage of Davis, 378 S.W.3d 426, 427 (Mo.App.2012); Rule 73.01(c).

. Doug served on some National Science Foundation panels, but this work varied year to year. He also worked part-time for an engineering firm prior to trial so he could pay expenses in the dissolution case.

. To quote Doug’s brief:
Father would concede that the Court should have given Mother the overnight credit she is entitled to based on the Court's parenting plan. Father’s Form 14 did not include an overnight visitation credit because Father was proposing no overnight visitation for Mother. Since the Court adopted its own parenting plan which included overnight visitation for Mother, the overnight visitation credit should have been included in the calculation for child support. Father believes that Mother would be entitled to a 6% credit for overnight visitation based on the number of overnight periods awarded in the parenting plan. Based on awarding a 6% credit for overnight visitation the new presumed child support amount would be $494.

.The court commends counsel for both parties for their professionalism throughout this appeal.