In the Interest of J.D.B. a/k/a J.D.B.

**CLAY COUNTY JUVENILE OFFICER, Respondent,**

v.

**K.S.(B.)C., Natural Mother, Appellant.**

**WD 43601.**

Missouri Court of Appeals, Western District.

July 23, 1991.

Gary K. Patton, Liberty, for appellant.

Max Von Erdmannsdorff, Kansas City, for respondent.

Before NUGENT, P.J.,
WASSERSTROM, Senior Judge, and
ULRICH, J.

WASSERSTROM, Senior Judge.

Pursuant to a petition of the Clay County Juvenile Officer, the Circuit Court on June 15, 1990, ordered termination of K.B.C.'s parental rights to her son J.D.B. K.B.C. ("the mother") appeals in forma pauperis, her attorney on this appeal serving without pay.

J.D.B. was born out of wedlock on August 10, 1981. Because of the conditions in which she lived, the mother received protective services from the Division of Family Services ("DFS") including Women, Infant and Children, emergency housing, public assistance, and food pantry referrals. At the time of the child's birth, the mother was living with her boyfriend. She moved from time to time thereafter until the spring of 1988 between her parents' home and that of the boyfriend. During all of that period, she worked at minimum pay jobs and she and the child received social agency services, including those of DFS, the Headstart program, the Visiting Nurses Association, K.U. Medical Center and the Joan Davis School.

In the fall of 1987, J.D.B. entered school but encountered much trouble and became out of control. He was placed with Oznam–Liberty School, but again he went out of control and suffered tantrums. Because of those problems he was taken for psychiatric care to Laughlin Pavilion Hospital, where he exhibited sexual behavior and allegations of sexual abuse surfaced.

In March, 1988, the child was placed with his grandfather, and both the mother and her boyfriend were charged with subjecting J.D.B. to sexual abuse. The male companion was found guilty after trial. The mother then came before the circuit court with legal counsel and entered an Alford plea of guilty. During the course of the proceedings on that guilty plea, she stated that she believed that the evidence against her would be overwhelming. The proceedings on that guilty plea show that she was fully advised of her rights by counsel and the court; and the nature of the plea and its consequences, including the effect it would have upon her rights of future custody of J.D.B., were fully explained to her. At the conclusion of that hearing, she was sentenced to one year in the county jail.

On May 12, 1988, the juvenile court held a hearing at which it found that the mother and her male companion had sexually abused J.D.B. and he was placed in the custody of DFS. The court order detailed the various acts of abuse, but repetition of those ugly descriptions here would serve no useful purpose. The mother was not represented by counsel at that hearing. DFS on July 6, 1988, placed the boy in the Spofford Home.

While the mother was incarcerated, DFS presented her with a Notice to Incarcerated Parent, advising her that to preserve her

rights with respect to the child she had to maintain a relationship with him, including visits, letters and gifts. Visits were impossible because not permitted by the boy to the jail or by the mother on any temporary release program. However, the mother did send a large volume of letters, cards, notes and presents. J.D.B. was told of this correspondence and presents from his mother, but that information evoked hostile reaction and he stated that he did not want to receive or be read any of that correspondence and he refused to acknowledge that the presents were from her.

At the Spofford Home, J.D.B. had great trouble socializing acceptably with his peers. He talked and acted out sexually, was hyperactive and was a slow ineffective learner. On occasion, he spoke of sexual acts which had been committed upon him, he stated resistance to being returned to the custody of his mother, and he expressed the hope of being adopted by a family "that doesn't do gross sexual things."

After serving her one year incarceration, the mother took up residence at Cedar's of Liberty, a nursing home. She is of borderline range mental retardation, and has obtained a job at Vocational Services for the Handicapped. Her total take home was approximately $60.00 per week, of which she has contributed $20.00 to her son's support pursuant to a "service agreement" with DFS. Also in accordance with that agreement, she has completed parenting classes at Tri–City Mental Health Center. She has continued her voluminous correspondence and gifts to the child and has repeatedly requested visits to her son which have been refused. She recently married a man not involved in any of her former trouble, and when last inspected maintained a clean acceptable apartment. She steadfastly denies that she perpetrated any sexual abuse upon J.D.B. or that she had knowledge that any such practices were being performed upon him.

At the time of the hearing on the petition to terminate parental rights, May 29, 1990, J.D.B. was almost nine years old. His stay at Spofford Home will necessarily come to an end at age twelve. The Spofford Home staff desires to institute efforts to place him for adoption, but such efforts can not be initiated unless and until the parental rights of the mother are terminated.

The professional staff of Spofford Home and DFS voiced opinions that the best interest of J.D.B. called for such termination of parental rights. Suzanne Hatcher, a Spofford Home psycho therapist, testified that there was no bonding between the mother and child, that the child evidenced a high anxiety level when any effort was made to discuss his mother with him, that he had been sexually abused and was aware of that fact, and that he was working desperately hard to fit into society.

Judy Coppaken, the Spofford Home primary therapist, testified that J.D.B. had a very negative response whenever his mother was mentioned. Any effort to discuss her, her letters or her presents evoked an angry and hostile reaction on his part. The child told Coppaken that the mother had done gross sexual things to him, that he did not feel safe with her, and that he never wanted to see or live with her. Coppaken testified that there was no bonding between the mother and child, and that there was only an extremely slim chance that the child could overcome his fear of his mother. Coppaken was of the opinion that J.D.B. needs a home where he can feel safe.

Mark Cederberg, the director of therapeutic services at Spofford Home, wrote a memorandum in May, 1989, recommending that consideration be given to strictly supervised visits by the mother with J.D.B., subsequent to the mother being given therapeutic help in private consultation. After that memorandum was written, Cederberg had further consultation with other staff members and he changed his opinion, as evidenced by a joint memorandum dated November 3, 1989, signed by him and Judy Coppaken jointly. That memorandum stated in part: "I cannot recommend that J____ be returned to a mother who is so low functioning * * * she would probably reside in her father's home if she gains custody. It could be devastating for J____ to

know that he has been deceived and is expected to live with the two people whom his problems originated from. In J___'s best interest, I strongly recommend that termination of parental rights be pursued."

The mother called as a witness Steve Dailey, the psychologist who conducted the parenting classes which she attended. Dailey testified that he recommended family therapy sessions to be attended by both mother and child. However, he further testified that he "had had no contact with the child, and did not know from that standpoint whether it would be advisable." He also testified that if a perpetrator of child abuse persists in denying that the abuse had occurred, that would be a detriment to that individual developing insights which would protect the child in the future.

In connection with the proceedings to terminate parental rights, Peter M. Schloss was appointed guardian ad litem for J.D.B. His report to the court after the hearing stated that he saw this as a very close case, but that "Since this is a very 'close call' I choose to 'err' in favor of non-termination and I recommend that the Spofford Home be given the opportunity to make an independent assessment of the mother's potential as a parent for the future and an assessment of the actual effect of an attempt to integrate visitation with the mother into the child's treatment."

The trial court made findings of fact which included a finding that the child had been abused and neglected and that there were severe and recurrent acts of physical, emotional or sexual abuse; that conditions of a potentially harmful nature continued to exist; and that there is little likelihood that those conditions will be remedied at an early date. In support of that conclusion, the court further found that the mother has continually maintained that she did not sexually abuse her son or have any knowledge of any abuse committed against him. The court continued: "For these reasons, the child is at risk of further abuse." Finally, the court found that termination of all parental rights of the mother would be in the best interest of the child.

## I.

■ The mother's first point on appeal argues that the juvenile officer failed to prove by clear, cogent and convincing evidence that termination of the mother's parental rights was in the best interest of the child. That argument errs in assuming that the clear, cogent and convincing standard of proof applies with respect to finding the best interests of the child.

Section 211.447.2(2)(c) R.S.Mo.1986, provides that the juvenile court may terminate parental rights upon a finding "that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist * * *." By this language, the legislature requires that the parent-child relationship not be interfered with except upon the finding of one or more of the specified statutory grounds, which must be shown by "clear, cogent and convincing evidence." One of those grounds is that the child must have been adjudicated abused or neglected, and in connection with such ground the juvenile court is directed to consider recurrent acts of sexual abuse by the parent. In this case, the mother has been convicted pursuant to a guilty plea of recurrent acts of sexual abuse toward J.D.B. That conviction in and of itself constitutes clear, cogent and convincing evidence of one of the grounds for termination. The mother in this court does not contend to the contrary.

■ She argues only that the child's best interest has not been shown by clear, cogent and convincing evidence. The legislature has not demanded that standard of proof for the best interest element, nor does the case law so require. Nevertheless, a juvenile court assumes an awesome responsibility when it directs the course of a young child's whole life. Before entering its order in that respect, the juvenile court should give close scrutiny to all factors in the child's situation.

■ A consideration of all those factors in this case support the juvenile court's finding that the best interest of the child

demanded termination of the mother's parental rights. The sexual abuse which had been committed by the mother and her former boyfriend severely traumatized J.D.B., and those effects still remain. He has a violently adverse reaction whenever any social worker attempts to discuss his mother with him and he wants to be adopted by a family that "doesn't do gross sex things to me."

The mother places considerable emphasis upon the May, 1989, memorandum by Cederberg which recommended that consideration be given to instituting strictly supervised visits by the mother with J.D.B. However, after further consultation with other staff members, Cederberg changed his mind about that recommendation and joined in a staff recommendation in November, 1989, that the parental rights of the mother be terminated.

The mother also places reliance upon the recommendation of her witness Dailey that family therapy be instituted, but Dailey in his testimony admitted that he had never met the child and "did not know from that standpoint whether it would be advisable." Furthermore, Dailey admitted in his testimony that the mother's continuing refusal to admit her participation or even knowledge of the sexual abuse was a detriment.

■ The mother's major reliance in connection with her first argument consists of the recommendation of the guardian who favored the institution of visits between the mother and child with an opportunity for the social workers to observe the results. The conclusions and recommendations of the guardian ad litem are entitled to respectful consideration, but the decision rests with the juvenile judge, not with the guardian, and it is to the findings of the juvenile judge that this court owes deference. The guardian considered this a "close case." After considering all factors and giving consideration to the guardian's recommendation, the juvenile judge found to the contrary. Under the standard for review set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976), the judgment of the juvenile court should not be disturbed. As in all other court tried cases, that standard of review applies in cases involving termination of parental rights. *R.L.P. v. R.M.W.*, 775 S.W.2d 167 (Mo.App.1989); *In re S.P.W.*, 707 S.W.2d 814 (Mo.App.1986); *In the Interest of M.E.W.*, 729 S.W.2d 194 (Mo. banc 1987).

II.

■ The mother's second point argues that the juvenile officer has failed to prove by clear, cogent and convincing evidence that the present home environment is unsuitable or poses an imminent danger to J.D.B. The present home environment is not the statutory ground upon which the juvenile court in this case terminated the parental rights, and therefore there was no necessity to show adverse present home conditions by clear, cogent and convincing evidence. Of course, the present home environment maintained by the mother is a factor affecting the best interests of the child, but as discussed above in this opinion, the best interests need not meet the clear, cogent and convincing standard of proof.

The evidence in this case shows that the mother has very markedly improved her home environment. Nevertheless, her past history of sex abuse upon J.D.B. casts a long shadow into the present and continues to poison the parent-child relationship. The praiseworthy efforts by the mother to improve herself and her environment has far less significance than the lasting effects which the past abuse has caused and still continues to cause to J.D.B. The legislature has mandated that social service agencies and the courts focus upon the child, not upon rehabilitation efforts by the parent. See § 211.447.4 which declares: "It is irrelevant in a termination proceeding that the maintenance of the parent-child relationship may serve as an inducement to the parent's rehabilitation."

Under this record, the changes accomplished by the mother in no way overbalance the lasting adverse effect which her past actions have had upon the child. Under *Murphy v. Carron*, the juvenile court's conclusion in that regard should not be disturbed.

### III.

The mother's final point on appeal argues that the juvenile court should have retained jurisdiction of the case in order that therapy and counseling between the mother and child might commence. That argument leaves out of account the testimony of the agency experts that such efforts at joint counseling would have very slight chance of success and would have severe adverse effect upon the child. Even more importantly, efforts at finding a home placement for J.D.B. would be impossible until the parental rights of the mother have been terminated. Under the standard of *Murphy v. Carron,* the conclusion of the juvenile court not to retain jurisdiction should not be disturbed.

The judgment of the juvenile court is affirmed.

All concur.