A. In my opinion, it is not.

Q. Thank you.

MR. TYSON: No further questions.

**In the Interest of: K.L.C., Minor,**

**G.C., Natural Father, Appellant,**

v.

**Greene County Juvenile Office, Respondent.**

**No. SD 30632.**

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 31, 2011.

Rehearing Denied Feb. 22, 2011.

Application for Transfer Denied
March 29, 2011.

Arthur E. Olson, Springfield, MO, for Appellant.

Bill Prince, Springfield, MO, for Respondent.

DON E. BURRELL, Judge.

G.C. ("Father") appeals the termination of his parental rights to and over his now preschool-aged daughter, K.L.C. ("Child").[1] The judgment entered by the Juvenile Division of the Circuit Court ("trial court") terminated Father's parental rights on the grounds of neglect and a failure to rectify the conditions that caused Child to come into alternative care ("failure to rectify").

In three points relied on, Father claims: 1) the trial court's findings of neglect and failure to rectify were not supported by substantial evidence and were against the weight of the evidence; and 2) the termination of Father's parental rights was not in Child's best interests. Finding no merit in Father's claims, we affirm the portions of the judgment related to Father.[2]

**Factual and Procedural Background**

Our recitation of the relevant facts is based upon the evidence as viewed in the light most favorable to the trial court's decision. *See In re M.R.F.*, 907 S.W.2d 787, 789 (Mo.App. S.D.1995). Child is the fourth child born to Mother and Father ("the parents"), who are married to one another and have resided together for many years. This is not the first time the parents have had their parental rights involuntarily terminated. The trial court took judicial notice of a prior case in which their rights to and over Child's three older siblings were terminated. That case file was not included in the record on appeal or otherwise deposited with this court. Respondent states in its brief that the prior involuntary termination occurred in 1999, and Father does not dispute this assertion in his reply brief. Father's brief states that the "other children came into foster care in 1995 due to concerns of Mother's mental condition and the condition of the home[.] Mother at that time reported thoughts of harming those children, including thoughts of cooking the youngest child in the oven[.]"[3] Because the trial court's findings in regard to Father are intertwined with and based in substantial part on Mother's continuing struggles with mental illness, many of the relevant facts revolve around her condition.

Child was taken into protective care directly from the hospital a few days after

---

1. Father was listed as the father on Child's birth certificate. The judgment also terminated the parental rights of Child's mother—who separately appealed the portions of the judgment relating to her—and any unknown biological father, finding that "[n]o other man has come forward to claim paternity of this child or to take any other action consistent with an intention to establish the parent and child relationship." Because neither party contests it, we presume Father's paternity for purposes of this appeal.

2. The trial court's judgment also terminated the parental rights of Child's mother ("Mother"). We refer to evidence about Mother only as it is relevant to the issues raised by Father.

3. Because the prior termination of parental rights occurred more than three years before the instant petition was filed, no statutory presumption of unfitness as set forth in section 211.447.5(6) was applicable. All statutory references are to RSMo Cum.Supp.2009.

her birth in January 2008. Medical records admitted at trial indicated that various members of the hospital's medical staff were concerned that the parents were not able to properly care for Child. The records indicated that Father could mix formula and provide some care for Child but had trouble recognizing Child's "stress cues." They also indicated that Mother used the dirty part of a wipe to clean Child when changing a diaper, wiped Child in the wrong direction, had trouble mixing formula, and could not determine how much formula Child had consumed by looking at the bottle. Before Child was taken into protective custody, an "Intensive In-home Services" ("IIS") worker was assigned to make home visits in anticipation of Child going home with her parents. The IIS worker's report stated that while the parents had made some improvements to their home, there was an ongoing problem with cockroaches.

On February 25, 2008, after a juvenile officer had taken Child into protective custody, the trial court conducted an evidentiary hearing and found that Child had been neglected by the parents and was thereby properly within the "jurisdiction" of the trial court.[4] The trial court then approved a proposed treatment plan for the parents and ordered them to comply with its terms. For the next year-and-a-half, various service providers and Children's Division employees worked with the parents in an attempt to allow Child to be safely returned to their care and custody. After eventually concluding that such a reunification would not be possible, on September 18, 2009, Respondent filed its petition to terminate parental rights. A trial on that petition was held on April 27 and 28, 2010, and May 17, 2010.

### The Termination Trial

Mother's treating psychiatrist testified that Mother suffered from schizoaffective disorder with a secondary diagnosis of obsessive-compulsive disorder. She also felt that Mother was affected by borderline personality disorder. According to the psychiatrist, Mother scored a "GAF" [general assessment of functioning] level of "48/55." She then testified that the level for someone "able to work and have . . . an ability to function every day would be probably closer to 80, 90." The psychiatrist had prescribed a number of medications for Mother and anticipated that Mother would need medication and psychiatric services on an on-going basis. And although she was unwilling to express a direct opinion about Mother's specific ability to parent, Mother's psychiatrist testified that "[a]t a period of exacerbation of the [schizoaffective] illness reality may not be fully intact, so yes, it would impact ability to parent." She then testified that obsessive-compulsive disorder "could affect [Mother]'s ability to respond to the immediate needs" of a child.

During the time Child was in alternative care, Mother was also treated by a series of five counselors or psychologists. With the exception of the psychologist treating Mother at the time of trial, Mother had discontinued counseling with each of them. The psychologist treating Mother at the time of trial testified that she had seen Mother four times. In their sessions, Mother "acknowledge[d] having a problem

---

4. The finding that a particular juvenile's circumstances meet the criteria set forth in section 211.031.1 has commonly been referred to as a determination that the juvenile is within the "jurisdiction" of the juvenile division of the circuit court. The term "jurisdiction" is placed within quotation marks in this opinion as a means of indicating that the term is being used in this customary manner and not in reference to either subject-matter or personal jurisdiction.

with anger[,] [ ] admit[ted] getting angry during FST[ [5] ] meetings and getting angry at her parenting aide, but then [Mother] seem[ed] to feel that her anger [was] justified and at times [she] [did] not feel that it [was] a problem." The psychologist observed that Mother "gets upset easily and [becomes] fairly defensive easily" but the psychologist did not think that they had reached a point in therapy where Mother could address some of her difficult issues. As a result, the psychologist opined that Mother's prognosis for anger management was "guarded simply because it doesn't seem that she fully acknowledges the extent to which her anger causes her a problem." In addition, the psychologist noted symptoms of paranoia, anxiety and "instability of mood."

In accordance with the opinion expressed by Mother's psychiatrist, the psychologist also anticipated that Mother would need counseling on a "long term" basis. The psychologist also noted that Mother did not "fully acknowledge [ ] the reasons [ ] why [Child] came into care or at least has not verbalized them to me." In the psychologist's opinion, Mother's condition could negatively affect her motivation and ability to make changes in response to services provided to her.

Dr. Mark Bradford, a clinical psychologist, completed psychological evaluations of both parents in February 2008, and those evaluations were admitted into evidence as Exhibits 13 and 14.[6] Doctor Bradford determined that Mother suffered from mild retardation, depression, paranoia, and "a good deal of anger and resistance with minimal understanding and acceptance of the problems."

Angela Wead, the family's foster care case manager from July 2008 until the time of trial, testified that the parents lived in the same home throughout her time on the case. During that time, Wead visited their home "at least 100" times, and neither parent expressed any intent to either move to a different residence or separate from one another.

Among other things, the trial court's judgment found that "[M]other suffers from multiple, serious mental conditions" and treatment services have been "unsuccessful due to the severity of [Mother]'s conditions and/or her unwillingness to cooperate with treatment providers." In re-

---

5. Children's Division caseworker Angela Wead and Mother's psychologists made references to a group known as a "family support team" and/or "FST" in their testimony. We presume this is the group referenced here.

6. Although Father discusses Exhibits 13 and 14 in his brief, they were not included among the exhibits deposited with this court. As a result, we presume their content provides additional support for the trial court's judgment. *See In re J.M.*, 1 S.W.3d 599, 600 (Mo.App. S.D.1999). Another psychologist testified that he had attempted to conduct a psychological evaluation of Mother on April 23 and 26, 2010, but did not feel that the testing was valid because Mother manifested such a lack of effort in the testing process. Another psychological evaluation was apparently completed just before Dr. Bradford's evaluation, and it was admitted into evidence as a part of Exhibit 3A. While this exhibit was also not deposited with this court, Father concedes in his brief that it reflected a diagnosis for Mother of "Schizoaffective Disorder, Obsessive–Compulsive Disorder, and a Global Assessment of Functioning of 60." Father's brief also states that the examiner "noted that Mother is so deluded and obsessive and full of doubt and suspicion that she ends up taking herself out of treatment." Father's brief indicates that Exhibit 3A included other, somewhat older evaluations and assessments of Mother. According to Father, one of those evaluations from 2003 noted that the "staff described Mother as very scary, and very mad." Another evaluation from 2004 reflected that although Mother had schizoaffective disorder, her obsessive compulsive disorder was in remission at that time and she was experiencing a stable mood.

gard to Mother, the trial court found that "[M]other's mental conditions are permanent and/or have no reasonable likelihood of being reversed" and her "conditions render her unable to knowingly provide [Child] with the necessary care, custody and control for [Child]." Additional facts and findings related to Father will be set forth in our analysis of his points.

## Analysis

■■■ "[B]ecause parental rights are a fundamental liberty interest, statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re S.M.H.,* 160 S.W.3d 355, 362 (Mo. banc 2005). Under section 211.447.6, parental rights may be terminated "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent and convincing evidence that grounds exist for termination...." "[C]lear, cogent and convincing evidence instantly tilts the scales in favor of termination when weighed against the evidence in opposition and the finder of fact is left with the abiding conviction that the evidence is true." *In re K.A.W.,* 133 S.W.3d 1, 12 (Mo. banc 2004). "In termination of parental rights cases, appellate courts defer to the trial court's ability to judge the credibility of witnesses and will affirm the judgment unless there is no substantial evidence to support it, it is contrary to the evidence, or it erroneously declares or applies the law." *Id.* at 11.

■■■ As to Father, Respondent alleged two grounds for termination: neglect and failure to rectify. *See* section 211.447.5(2) and (3). The trial court found that both grounds had been proven by clear and convincing evidence. "When a trial court finds multiple statutory bases to terminate a parent's rights, we need only determine that one of the statutory grounds was proven in order to affirm the judgment." *In re K.M.C., III,* 223 S.W.3d 916, 926 (Mo.App. S.D.2007).

### Point I—Father Neglected Child

■■■ Father's first point asserts the trial court's finding that Father neglected Child was not supported by substantial evidence and was against the weight of the evidence. "Courts define neglect as the failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *In re C.L.W.,* 115 S.W.3d 354, 358 (Mo.App. S.D.2003). While neglect includes the failure to protect a child from abuse, *see, e.g., In re P.L.O,* 131 S.W.3d 782, 790 (Mo. banc 2004) (neglect found where mother acknowledged that some abuse had occurred and failed to protect child from sexual abuse), it also occurs if a parent fails to separate the child from an unsuitable caretaker. *See In re B.D.W.,* 185 S.W.3d 727, 738 (Mo.App. S.D.2006) ("The evidence of the intentional, deliberate choice by [them] other of involvement with a clearly unsuitable husband and father, rather than choosing to parent [the child] is sufficient evidence of neglect").

Father's point incorporates the following six factual averments:

a. The Team[7] and the trial court did not have any concern as to whether Father recognized that Mother has diminished intellectual capacity, or whether Mother had an [ ] untreatable mental condition, or that Mother was a substantial danger to [Child];

---

7. Presumably, Father's reference here is to the "Family Support Team" or "FST."

b. Father did not have anger issues, and it was uncertain whether he needed therapy;

c. Father showed appropriate parenting skills, had appropriate unsupervised time with [Child], Parent Aides voiced no concern with Father's ability to parent, and Father was able to assimilate parenting skills;

d. Father had a long job history before he was laid off, would work odd jobs while looking for employment, and received unemployment compensation;

e. Mother and Father did provide financial and in-kind items of support for [Child];

f. Father had an appropriate residence where unsupervised visitation occurred frequently, and the family home had sufficient income to support [Child].

While the trial was not without some positive testimony about Father's ability to properly support and care for Child, the "standard of proof [clear, cogent and convincing evidence] may be satisfied even though the court has contrary evidence before it or the evidence might support a different conclusion." *K.M.C., III,* 223 S.W.3d at 922. And while Father's statement of facts properly sets forth facts favorable to the trial court's judgment, his argument then goes astray by focusing instead on the evidence inconsistent with the judgment. As earlier indicated, our standard of review requires us to view "[c]onflicting evidence [ ] in the light most favorable to the judgment of the trial court." *S.M.H.,* 160 S.W.3d at 362.

*Father Neglected Child by Failing (or Refusing) to Recognize the Danger in Allowing Mother to Continue to Act as Child's Primary Caregiver*

The record refutes Father's contention that no concern had been expressed about his failure to recognize Mother's limited capacity, her mental illness, and the substantial danger she posed to Child. The trial court's finding was that "[a]lthough [Father] does not suffer from such a mental condition, he does not recognize that [Mother] suffers from untreatable mental conditions that prevent her from parenting effectively." It also found:

Given that [Mother] is the primary caretaker for [Child] during visits, that [Father] is unwilling and/or unable to acknowledge that [Mother] presents a substantial danger to [Child], that [Father] sees no reason for [Mother] or he to change, and that [Mother] and [Father] have been married for several years with no intention to discontinue their relationship, the [trial] [c]ourt has no confidence that [Father] could or would take adequate steps to protect [Child] from [Mother].

Wead testified "that [Mother] doesn't recognize her own limitations and [ ] [Father] does not recognize Mother's limitations." Father attended six counseling sessions with Brooke Githegi in April and May 2008, but she was unable to establish trust or rapport with him and referred him to another counselor. Githegi testified that Father "didn't understand why he was in therapy." Thereafter, Father counseled with Steven Reiutz from May 2008 until May 2009, when Father stopped attending. Reiutz testified that Father understood that his rights to other children had been terminated and that other people "felt that he and [Mother] were not able to take care of [Child]." Reiutz said Father "was content with things as they [were]" at that time. Father did not want to discuss Mother during counseling. Father "just said she is who she is, and that's his wife. He let her make her decisions."

The trial court noted that Mother and Father "have a history of failing to provide appropriate care for children, as evidenced by the involuntary termination of their parental rights to three other children[.]" Even though that event had occurred several years before the instant petition was filed, "[a] parent's past abuse of other siblings is evidence of a home environment that is *currently* dangerous to the child for whom termination is sought." *In re M.W.S.*, 160 S.W.3d 435, 440 (Mo.App. W.D.2005) (mother's previous abuse and neglect of other siblings relevant to likelihood of abuse and neglect due to mother's mental illness) (emphasis in original). Dr. Bradford noted the impact past events may have on the present when he found testimony that the parents could not talk about the removal of the other children "concerning because if you can't get over that it makes it really hard to accept change."

Father concedes in his brief that Reiutz's notes indicated that Father believed there was little point in changing—that he was satisfied with everything as it was but wanted Child returned to the family. As Respondent pointed out in its brief, Father "has demonstrated a commitment to remaining with [Mother] as evidenced by having been with [Mother] since prior to 1999 when rights to his other three children were terminated[.]" Because Father and Mother shared the same home and Father was content to let Mother behave as she wished, this testimony constituted substantial evidence that Father had neglected Child by his willingness to allow Mother to provide Child's primary care and that he had no intention of departing from that plan.

### Father's Anger "Issues" Impeded Remediation of the Neglect

The trial court found that Father was "stubborn, strong-willed, and angry. [Fa-ther] was still angry over the removal of his oldest children." Wead testified that she recommended Father continue in counseling when she took over the case because he "seemed quite angry with the situation[.]"

According to Father's brief, Dr. Bradford "diagnosed Father with Chronic Adjustment Disorder Unspecified, Borderline Intellectual Functioning, Mixed Personality with Paranoid and Passive Aggressive Features, and gave Father a Global Assessment of Functioning of 65." Dr. Bradford testified:

> [Father] should be able to assimilate change and he could be the stronger of the parents in the household if he would so [sic] desire to do so. The troubling fact with [Father] was he was quite angry when I saw him and very resistant to full cooperation with [my] office. That raises—That smacks of a potential personality problem and an anger issue that can be a regular trait—it could be an ingrained trait that doesn't change as opposed to a temporary state that might pass.

Dr. Bradford stated Father's "general demeanor was that of a pretty angry man, and we were just trying to survive and do our job and get an evaluation done." Dr. Bradford could not say whether Father was always angry, but did say that Father was "demonstrative of a guy who was going through the motions but angry to participate." While Reiutz indicated that Father's anger may have been a way to distance others instead of displaying a temper management issue. A reasonable inference from this testimony is that Father's anger would prevent him from learning parenting skills from others. Dr. Bradford testified that if Father had expressed a reluctance to change and had stopped his counseling, then it was proba-

ble that Father had an enduring perspective of anger. Dr. Bradford indicated that this would make it difficult for Father to listen to and follow the advice of others.

Father also misconstrues Reiutz's testimony about Father's need for further counseling. Reiutz was not sure that Father needed to be in counseling because Reiutz was unable to get Father to discuss the relevant issues with him. Reiutz testified that "when [Father] got to a point where he didn't want to talk, there wasn't much we could do." When his testimony is considered as a whole, it is clear—as the trial court found—that Reiutz could not recommend further counseling because Father's refusal to meaningfully participate in counseling made the situation futile. The evidence refutes Father's contentions on appeal that he did not have anger issues and that it was "uncertain whether he needed therapy." To the contrary, Father consistently demonstrated anger issues and his refusal to meaningfully participate in counseling was significant because it further supported the trial court's lack of confidence that Father would "work on his issues and accept services" so as to "meet minimal parenting standards" in the reasonably foreseeable future.

### Father's Limited Parenting Skills and Failure to Improve Them Contributed to His Ongoing Neglect

Father's contentions on appeal that he "showed appropriate parenting skills," that parent aides expressed no concerns about his ability to parent, and that there was "no evidence at trial that Father did not supervise [Mother] appropriately" are also refuted by evidence the trial court was entitled to believe. The trial court found that "[d]espite parenting classes and the assistance of parent aides, [Mother] and

[Father] would require third-party supervision of their visits with [Child] and one-on-one assistance with parenting [Child] into the foreseeable future."

Wead testified that visitation in the home began with once-a-week supervised visits for four hours. Another day per week was later added to permit a parent aide to assist Mother while Father worked. After Father became unemployed and parent-aide assistance had stopped, "[v]isits gradually increased to become unsupervised where it was both [Father] and [Mother], and [Father] would have been supervising [Mother]'s visit, but that was very gradual and that happened over the course of this case." Visitation peaked at 16 hours per week.

In April 2009, Wead stated that Child's "behavior seemed to change drastically" and a developmental screening indicated that "she had regressed. This was all after a visit." The "team" could not determine what had caused Child's distress, but it decided to provide another parent aide during two hours of the visitation schedule. Child had experienced troubled sleeping patterns for a period of time, and in August 2009, after a doctor's report and a court hearing, the total time of the parents' visitation was reduced and the assistance of a parent aide was continued. By March 2010, Mother's mental health had deteriorated to the point that visitation was reduced to eight hours per week and was fully supervised by a parent aide.

During Wead's last pre-trial visit to the parents' residence, she noted that there was still a hole in the bathroom ceiling that leaked water and permitted mold to grow on the ceiling and upper walls. The damage had apparently existed for quite some time. Father said that he did not have the money to get the necessary repairs made because he could not afford to pay the deductible on his insurance policy. Wead

testified that Father tried to get assistance in meeting his deductible from a community agency, but it was not able to help.

The home was infested with cockroaches at two different times, and the parents worked to eradicate the infestation. The parents had an ongoing problem with having significant clutter in the home, including an occasion on which one of the doors to Child's room was blocked by piled clothing. But Mother did a good job of cleaning the home when the necessity of it was brought to her attention.

Wead testified that the parents' "[l]imitations in understanding child development and understanding age [-] appropriate safety issues, whether or not [Child] would know that something was safe or unsafe [,]" prevented her from recommending that Child be returned to the parents. She gave the example of the parents being instructed that they needed to put up a gate or other barrier to protect Child from falling into the home's hot furnace grate. Father advised that Child (at age two) would "just know" not to go near it.

Parent aide Janet Harp worked with the parents from June 2009 to the time of trial. She testified that Mother "is always very, very involved with [Child]. [Father] is also involved with [Child], but he kind of steps back and lets [Mother] do the majority of the care until she says, 'Here, [Father], it's your turn.'" Over time, Father was getting more involved. In June 2009, shortly after she started working with the parents, Harp stated in a written report that she would be in favor of beginning to allow the parents to have Child for overnight visits as long as both parents would be present the entire time. In November 2009, she stated in a written report that she would "not be opposed to [Mother] having a little more unsupervised time with [Child] if [Father]'s work schedule precludes him from being at the entire visit." She also testified that having Child in the parents' home at that time did not cause her any "physical safety concerns."

Harp worked on consistency issues with the parents in teaching Child not to hit and to have "gentle hands" because at age two-and-a-half she "kind of runs the show." Harp believed that Mother took things too personally, both in terms of learning parenting skills and in interacting with Child. For instance, when Mother asked Child if she loved her, and Child responded that she loved "Daddy," Mother took this "very, very personally" and resisted the idea that children just say things like that at that age to tease their parents. Harp was concerned that this would be a problem as Child got older. Harp testified that neither parent was able to point out new developmental stages Child was reaching without being prompted to do so.

By the time of trial in April 2010, Harp could not recommend that Child be returned to the parents without parent-aide supervision.[8] She testified that the need

8. Three other parent aides that served before Harp also testified at trial. Charlotte Nolan testified that she assisted Father and Mother four times in January and February 2008. She observed that the parents were bonded with Child. Mother and Father were willing to try the skills that Nolan taught them, "but [at] each session those skills had to be retaught and gone over again each time." At the end of Nolan's assignment, the parents still needed to work on "daily care" such as bathing, feeding, and a sleeping schedule. Bonnie Adams provided parent-aide services in from April 2008 to July 2008. She found the parents actively involved in sessions and willing to learn, although Mother was frustrated when trying to learn to do more than one task at a time—such as doing laundry while cooking. Father sometimes provided more care and his skills improved over time. Cockroaches were a problem, but the parents worked at getting rid of the bugs and the

for such supervision would likely be long-term, and one-on-one. Harp testified that she was not aware of how the parents could procure such long-term parenting assistance.

Reiutz testified that he had observed Father with Child and that Father "was very positive with her." But as noted in Father's brief, Reiutz's progress notes (admitted into evidence as Exhibit 12) expressed a concern that Father was unwilling or unable to interact with Child by getting on the floor with her.[9] Father's brief also noted Reiutz's uncertainty about Father's ability to react and keep Child safe if she started to fall or do something that might harm her.

Substantial and competent evidence demonstrated that Father's unassisted supervision of Child was inadequate—that ongoing, full-time supervision by someone like a parent aide would be necessary. Father failed to ·consistently clean and maintain the home himself and was unable to persuade Mother to do it. Proper maintenance of the home consistently required the intervention of third persons. Perhaps more troubling was the fact that Father's ability to provide Child with sufficient supervision and care seemed to be deteriorating, not improving, as the case moved closer to trial.

### Father Was No Longer Able to Provide Child with Adequate Financial Support

The trial court found that Father "chose to remain unemployed, only working temporary jobs sporadically. [Father] provided no verification of this employment." The trial court further found that Father's "skills and training could be put to use by an employer if [Father] were willing to work." These findings were supported by substantial evidence.

■ Father is correct in asserting that the evidence showed that Father had a significant history of steady employment before he was laid-off and that he thereafter received unemployment compensation. There was also no evidence that Father's loss of his long-term job was due to any fault on his part. But these historical facts did not relieve Father of a continuing responsibility to support himself and Child to the best of his ability, and the evidence supported the trial court's conclusion that Father was not using his best efforts to do so. "If a parent is unable to pay for all of a child's financial needs, he or she has a duty to provide as much as he or she reasonably can." *S.M.H.*, 160 S.W.3d at 367.

Wead testified that Father had been employed as a mechanic by the same company for approximately 15 years before he was laid-off in October 2008. Thereafter, Father obtained his commercial driver's license and worked "odd jobs." According to Wead, while Father occasionally reported to the team that he was working temporary jobs, he refused to identify his employers or provide the team with any pay stubs to verify that employment. Father indicated to Wead that he was looking for

---

roach situation improved to "pretty average." At the time she stopped working on the case, Adams felt that the parents would have "absolutely" benefited from further parent-aide services. Joy Brown provided parent-aide services in July and August 2008. She testified that Father was appropriate and affectionate with Child and she was at ease with him, but Mother provided more care. Ms. Brown believed there was an ongoing concern about the cleanliness of the house.

9. Although Father addressed Exhibit 12 in his brief, it was not included with the other exhibits deposited with this court. Again, we presume its content provides additional support for the trial court's judgment. See *J.M.*, 1 S.W.3d at 600.

work but had been unable to find a job in Springfield due to the economy. Wead noted that Father could not expect his unemployment compensation benefits to go on forever, and she was unaware of any reason why Father could not work. Counselor Reiutz testified that he encouraged Father to look for work, but Father was "reluctant."

Father asserts that he, with Mother, provided Child with financial support. Father did pay some child support despite being unemployed, and Mother and Father also provided Child with some in-kind items, such as diapers, food and clothing. But Father's unpaid child support obligation began accumulating before he was laid-off from his long-term job, and Father had paid only $3,616.17 of the $12,300 he owed. The clothing the parents provided was sometimes too small or too large for Child. Father also conceded in his brief that he spent part of his 401k savings to buy a flat-screen television and an above-ground swimming pool. Father's monthly budget also included $205 per month for the category "Cell Phone/Cable/Internet/Satellite."

The trial court found that the parents' "financial situation has only grown worse since [Child] came into care." A temporary forbearance agreement was used to prevent immediate foreclosure proceedings on their home, but a payment in excess of $4,000 was due in August 2010 in addition to new monthly payments. Wead testified that according to Father's budget, the family was short about $200 each month. If Child lived in the home, the parents would increase their net income by the amount of the future child support payments they would no longer be ordered to pay, but their expenses would also increase as soon as they became fully responsible for Child's care.

■ Substantial evidence established that Father could have provided more monetary support for Child than he did, and that he was not behaving responsibly by refusing to provide proof of temporary earnings and only "reluctantly" seeking work when his unemployment benefits could not be expected to continue indefinitely. This is not to say that a failure to pay child support or deficient financial skills by themselves warrant a termination of parental rights. *See S.M.H.*, 160 S.W.3d at 367 (consideration of financial support for termination of parental rights is not restricted to whether parent failed to pay court-ordered child support). Rather, the evidence combined with other evidence to demonstrate that Father had failed to adequately support, care for, and protect Child. While Father provided some support for Child, the evidence clearly, cogently, and convincingly established that he did not meet his obligation to provide Child with all of the support Father could reasonably have been expected to provide. Point I is denied. Because sufficient proof of one statutory ground for termination is sufficient, and the trial court's finding that Father had neglected Child was supported by sufficient evidence, we do not address Father's point II challenge to the trail court's termination based on failure to rectify.[10]

---

10. Father's brief does not even attempt to show why all material evidence favorable to the judgment "was so lacking in probative value, when considered in the context of the totality of the evidence, that it failed to induce belief in the existence of [the challenged finding]-the fourth and last step necessary to mount an against-the-weight-of-the-evidence challenge." *Houston v. Crider*, 317 S.W.3d 178, 188–89 (Mo.App. S.D.2010). As a result, we consider Father's assertion that the trial court's judgment was against the weight of the evidence to have been abandoned. *Citi-*

*Point III—Child's Best Interests*

In addition to repeating the factual allegations set forth in subpoints a, d, e, and f of points I and II, Father contends in his third point that Child "had healthy emotional ties to Father" such that there was no substantial evidence that termination was in the best interests of Child and was against the weight of the evidence.

While the "clear, cogent and convincing evidence standard" is used in review of the grounds for termination, it is not the standard we apply to our review of the trial court's determination that termination was in Child's best interests. "Instead, review of the best interest findings is for abuse of discretion." *In re E.D.M.,* 126 S.W.3d 488, 497 (Mo.App. W.D.2004); *see also P.L.O.,* 131 S.W.3d at 789. "It is a subjective assessment of evidence that is not reweighed by appellate review." *In re D.L.W.,* 133 S.W.3d 582, 585 (Mo.App. S.D. 2004).

The trial court agreed with Father that Child "had positive emotional ties to [Mother] and [Father], but [found that] she also had positive emotional ties to her foster parents." Wead testified that Child was bonded to both parents, but Child also "seem[ed] very bonded to the foster family." Father challenged the trial court's consideration of foster-parent bonding in assessing Child's best interests, citing language in *In re C.W.,* 211 S.W.3d 93 (Mo. banc 2007) that "[i]t is almost a foregone conclusion that the bond between parent and child will not be as strong as it otherwise would. *Id.* at 101. Courts should take into account this reality when passing judgment upon the bond between parent and child." But this is not a case where the trial court determined that Child's bond with her foster parents outweighed

her bond with the parents and then found it in Child's best interests to terminate parental rights based on that finding. The trial court simply found that the evidence established that Child was bonded with both families.

The trial court also considered that, despite the assistance and services

> [R]endered over the more than two years that [Child] has been in care, [Mother]'s mental conditions, which are detrimental to the health and welfare of [C]hild as set forth above, persist, and [Father] remains oblivious to [Mother]'s mental conditions and limitations that present a danger to [Child]. [Mother] and [Father] will require third-party supervision of their visits with [Child] and one-on-one assistance with parenting [Child] into the foreseeable future.... There is little likelihood that within an ascertainable period of time [Mother], [or] [Father] ... would be able to resume the care, custody and control of [Child].

The trial court also found that a continuation of the parent-child relationship would "greatly diminish [ ] [Child]'s prospects for early integration into a stable and permanent home." Wead testified that Child had been in the same foster home since January 2008 and that the foster parents were willing to make that relationship permanent. When conditions supporting termination have not abated, the trial court does not err in considering the child's interest in moving from foster care to a permanent home with the chance of adoption. *See In re J.K.,* 38 S.W.3d 495, 502 (Mo.App. W.D.2001) (noting that a child should not have to live indefinitely in foster care).

Wead observed Child in the foster parents' home and found that in that environment she was "a very happy content little

girl who loves to explore and play with her toys. She loves to sing and dance, play hide and seek." Wead was not aware of any additional services that could have been provided to the parents that had not already been offered and/or provided. In addition to her other testimony, Wead recommended that the court terminate parental rights and allow Child to achieve "permanency [ ] outside the parental home."

Child's guardian *ad litem* ("GAL") also recommended that parental rights be terminated. While trial courts do not have to defer to a GAL's recommendation, "[t]he conclusions and recommendations of the [GAL] are entitled to respectful consideration[.]" *In re J.D.B.*, 813 S.W.2d 341, 345 (Mo.App. W.D.1991).

The trial court's finding that terminating Father's parental rights would be in Child's best interests was also supported by substantial evidence. Father's third point is also denied, and the judgment of the trial court regarding Father is affirmed.

BARNEY, P.J., and LYNCH, J., Concur.